**Ed COLEMAN, et al., Plaintiffs,**

v.

**EXXON CHEMICAL CORPORATION, Defendant.**

**No. H–99–4543.**

United States District Court, S.D. Texas, Houston Division.

Aug. 2, 2001.

---

Margaret Ann Harris, Butler & Harris, Houston, TX, Marguerite K. Kingsmill, Laura Hedberg Spalding, House Kingsmill et al, New Orleans, LA, Barbara G. Haynie, New Orleans, LA, for Plaintiffs.

Nicholas Vincent, David M. Rivet, Exxon Mobil Corp. Legal Counsel, Anthony P. Rosenstein, Baker & Botts, Houston, TX, for Defendant.

### MEMORANDUM AND ORDER

ATLAS, District Judge.

This is a Title VII employment discrimination case. Plaintiffs Ed Coleman, Carl McClore, Charlotte Allen, Reginald Carter, Tony Williams, Gaines Owens and Joseph Sloan contend that they have suffered disparate treatment on account of their race [1] while employed at Defendant Exxon Chemical Corporation ("Defendant" or "Exxon"). Specifically, Plaintiffs allege that the competitive ranking system Exxon uses to rate its employees and determine their salary allows the racial and/or gender biases of supervisor-rankers to run unchecked. Plaintiffs contend that their rankings have been artificially depressed due to unlawful animus on the part of some of the rankers, and that they have suffered a corresponding loss of pay. Defendant has moved for summary judgment as to all Plaintiffs.[2] After extensive briefing by the parties and oral argument,[3] the motions are ripe for adjudication. Having considered the parties' briefs, all matters of record and the applicable authorities, the Court concludes that Defendant's motions for summary judgment as to all Plaintiffs should be **granted**.[4]

### I. BACKGROUND

All of the Plaintiffs work at Exxon's Baytown Olefins Plant ("BOP") in Baytown, Texas. By and large, Plaintiffs be-

---

1. Charlotte Allen also alleges disparate treatment because of her gender.

2. See Defendant's Motion for Summary Judgment on the Claims of Ed Coleman [Doc. # 34] ("Coleman Motion"); Defendant's Motion for Summary Judgment on the Claims of Carl McClore [Doc. # 35] ("McClore Motion"); Defendant's Motion for Summary Judgment on the Claims of Charlotte Allen [Doc. # 41] ("Allen Motion"); Defendant's Motion for Summary Judgment on the Claims of Reginald Carter [Doc. # 42] ("Carter Motion"); Defendant's Motion for Summary Judgment on the Claims of Tony Williams [Doc. # 43] ("Williams Motion"); Defendant's Motion for Summary Judgment on the Claims of Gaines Owens [Doc. # 44] ("Owens Motion"); Defendant's Motion for Summary Judgment on the Claims of Joseph Sloan [Doc. # 45] ("Sloan Motion").

3. See Response of Ed Coleman and Carl McClore to Defendant's Motions for Summary Judgment [Doc. # 40] ("Coleman/McClore Response"); Response of Charlotte Allen, Reginald Carter, Tony Williams, Gaines Owens and Joseph Sloan to Defendant's Motion for Summary Judgment [Doc. # 47] ("Allen, et al. Response"); Supplemental Response of Plaintiffs to Defendant's Motion for Summary Judgment [Doc. # 50] ("Plaintiffs' Supplemental Response"); Defendant's Reply to the Response of Ed Coleman and Carl McClore [Doc. # 49] ("Coleman/McClore Reply"); Sur–Reply of Ed Coleman and Carl McClore [Doc. # 53] ("Coleman/McClore Sur–Reply"); Defendant's Reply to the Response of Charlotte Allen, et al. [Doc. # 54] ("Allen, et al. Reply"); Sur–Reply of Charlotte Allen, et al. [Doc. # 58] ("Allen, et al. Sur–Reply"); Plaintiffs' Memorandum Regarding Workplace Remarks/Comments [Doc. # 57] ("Racial Comments Brief"); Plaintiffs' List of Rank List Comparators [Doc. # 60, sealed] ("Comparator List"); Defendant's Final Submission on Pending Motions for Summary Judgment [Doc. # 61] ("Defendant's Final Submission"). Oral argument was heard on May 23, 2001.

4. Accordingly, Defendant's Conditional Motion for Separate Trials [Doc. # 64] is denied as moot.

gan working at BOP in the late 1970s. All hold or have held the position of first-line supervisor ("FLS"). FLSs, as well as various "specialists," are grouped together for ranking purposes (the "FLS/Specialist rankings"). McClore, Allen, Williams and Sloan currently are FLSs. Owens moved from FLS to training coordinator in the late 1980s. However, he refers to himself as a FLS and continues to be included in the FLS/Specialist rankings. Carter moved from a FLS position into contract administration in 1998, as did Coleman in 1999.

At BOP, a FLS's job performance is evaluated in two ways. First, each FLS receives a personal evaluation from the second-line supervisor ("SLS") who directly supervises him or her. The evaluation, or "performance and coaching" ("PAC") worksheet, is a standardized form listing various performance criteria in which the employee is rated "better" than, "similar to," or "below" most. The PAC also provides room for the SLS's comments.

Second, all FLSs and comparable specialists are competitively ranked against each other. The rankings are performed by SLSs, with review and supervision from human resources and senior management at BOP. A new rank list is generated each year. The rank list is divided into five quintiles, the first quintile being the highest. A FLS's quintile is a significant factor in determining his salary. Although only the *quintile* ranking impacts salary,[5] the forty-odd FLSs at the plant are given individual rankings from a high of 99 to a low of 1.

Although Plaintiffs were aware that a competitive ranking system was in place prior to 1998, FLSs were not informed of their exact place on the rank list.[6] In May 1998, an employee found a copy of the 1998 draft rank list on the company computer system. The list was quickly circulated among the FLSs, many of whom were dismayed to learn their rankings after receiving predominantly positive evaluations in their individual PAC forms.

The following chart shows each Plaintiff's rankings for the years 1996 to 2000[7]:

| | 1996 | 1997 | 1998 | 1999 | 2000 |
|---|---|---|---|---|---|
| Coleman | 79 | 75 | 65 | 60 | 69 |
| McClore | 35 | 38 | 43 | 42 | 35 |
| Allen | 11 | 19 | 14 | 12 | 20 |
| Carter | 33 | 22 | 28 | 20 | N/A |
| Williams | 55 | 54 | 49 | 47 | 62 |
| Owens | 30 | 22 | 14 | 12 | 13 |
| Sloan | N/A | N/A | 40 | 30 | 24 |

*See* Redacted Rank Lists (Ex. D to McClore Motion).

After the disclosure of the rank list, several African–American FLSs met to

5. While the parties agree that this is the case, the exact pay differential among the quintiles is unclear from the record. It appears that salary is determined by the FLS's seniority, quintile, and department. *See* Deposition of Gail Culberson (Ex. H to Coleman/McClore Response) ("Culberson Deposition"), at 112–13.

6. A FLS could, upon request, find out what *third* of the rank list he fell into.

7. Each rank list reflects the employee's performance for the preceding year (*e.g.*, the 1996 rank list reflects 1995 performance).

discuss their perception that minorities and women were clustered in the bottom quintiles of the rank list. While the average rank on the 1998 rank list for all FLSs was 52, the average rank for minorities was 38 and the average rank for women was 14. *See* Skewing Data (Ex. D to Coleman/McClore Response). Separate data (in which women appear to be grouped with minorities) show the quintile distribution of the sixteen minority FLSs:

| | |
|---|---|
| First Quintile | 1 employee |
| Second Quintile | 2 employees |
| Third Quintile | 4 employees |
| Fourth Quintile | 4 employees |
| Fifth Quintile | 5 employees |

*See* Profile of 1998 Ranking of First Line Supervisors, attachment to Affidavit of Carl McClore (Ex. C to Coleman/McClore Response) ("McClore Affidavit").

On June 30, 1998, several FLSs sent a letter to the plant manager at BOP, expressing their dissatisfaction with the rankings of minority FLSs and requesting an investigation into the ranking system.[8] *See* Letter to D.G. Blake, June 30, 1998, attachment to McClore Aff. In response, the plant manager Del Blake and Human Resources Manager Gail Culberson met with a group of minority employees. *See* Notes of Meeting, July 28, 1998 (Ex. 25 to McClore Motion). Culberson later conveyed the employees' concerns with the ranking system to the SLSs. *See* Affidavit of Gail Culberson (Ex. A to McClore Motion) ("Culberson Affidavit"), ¶ 26. In addition, Blake commissioned a task force to examine the current ranking system and make suggestions for improvement. Culberson Aff., ¶ 27. Both Coleman and McClore were members of the task force. *Id.*

The task force made a number of recommendations, many of which were adopted. *See* Ranking Implementation Team Summary of Key Recommendations (Ex. 137 to McClore Motion) (showing which recommendations of the task force were implemented). However, Defendant and Plaintiffs agree that no significant changes were made as a result of the task force: in Defendant's view, the concept of competitively ranking FLSs remains intact; and in Plaintiffs' view, problems of gender and racial bias persist. *See* Culberson Aff., ¶ 32; Coleman Aff., ¶ 8; McClore Aff., ¶ 6.

Plaintiffs filed a charge with the Equal Employment Opportunity Commission ("EEOC") on February 24, 1999. After receiving a right to sue notice, Plaintiffs filed this case on December 30, 1999. *See* Complaint [Doc. # 1]. Plaintiffs allege that the ranking system disparately impacted minorities and women. *Id.*, ¶¶ 7, 12. Plaintiffs also allege in their Complaint that because the ranking system allowed the racial biases of SLSs to run unchecked, they have suffered disparate treatment and pattern and practice race discrimination. *Id.*, ¶¶ 7, 8. Plaintiffs contend that their depressed rankings result-

---

**8.** This was not the first time employees had expressed dissatisfaction with the status of minorities at BOP. In 1991, a focus group was commissioned to address the question of "why Black employees do not feel they are a part of the BOP organization." *See* Focus Group Findings, August 12, 1991, attachment to Affidavit of Ed Coleman (Ex. B to Coleman/McClore Response) ("Coleman Affidavit"). Coleman, McClore and Sloan were all members of the focus group. Some of the group's chief concerns were a lack of minority representation in management and upper supervisory positions; a feeling that minorities were held to different performance expectations; and a lack of sensitivity to diversity issues. *Id.* Coleman and Sloan contend that very little was done to address these concerns. Coleman Aff., ¶ 27; Affidavit of Joseph Sloan (Ex. D to Allen, *et al.* Response) ("Sloan Affidavit"), ¶ 22.

ed in lost pay and promotions. *Id.*, ¶¶ 8, 10. Plaintiffs also originally alleged hostile environment and retaliation claims. *Id.*, ¶ 15. At the Court's request, Plaintiffs subsequently clarified their claims. *See* Supplemental Response, at 1–5. Plaintiffs now raise only disparate treatment claims on the basis of race (and, for Charlotte Allen, gender).[9] *Id.* at 1. Gaines Owens also contends he has suffered retaliation since complaining to BOP management about the ranking system's impact on minorities. *Id.* Plaintiffs explicitly have relinquished any disparate impact, pattern and practice, and hostile environment claims. *Id.* at 2 n. 1, 3 n. 3. In addition, Plaintiffs no longer contend that they were denied promotions as a result of artificially low rankings. *Id.* at 2.

## II. *SUMMARY JUDGMENT STANDARD*

In deciding a motion for summary judgment, the Court must determine whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Heritage Bank v. Redcom Laboratories, Inc.*, 250 F.3d 319, 325 (5th Cir.2001). Material facts are those facts that might affect the outcome of the suit under the governing law. *Martin's Her-*

*end Imports, Inc. v. Diamond & Gem Trading U.S.A. Co.*, 195 F.3d 765, 773 (5th Cir.1999). "Factual controversies are construed in the light most favorable to the nonmovant, but only if both parties have introduced evidence showing that an actual controversy exists." *Edwards v. Your Credit, Inc.*, 148 F.3d 427, 432 (5th Cir. 1998).

Summary judgment is inappropriate if there is a "dispute in the substantial evidence, that is, evidence which is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions. Consequently, a mere scintilla of evidence is insufficient to present a question for the jury." *Chaney v. New Orleans Public Facility Mgmt.*, 179 F.3d 164, 167 (5th Cir.1999). A nonmovant may not defeat summary judgment with allegations or denials in the pleadings or with "unsubstantiated or conclusory assertions that a fact issue exists." *See, e.g., Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir.1998). In the absence of any proof, the court will not assume that the nonmovant could or would prove the necessary facts. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994) (*en banc*).

## III. *DISCUSSION*

Plaintiffs contend that, as a result of race and gender discrimination at BOP,

---

**9.** Plaintiff contends that the relevant time period for this case is 1993 to 1998. *See* Opposition to Defendant's Conditional Motion for Separate Trials [Doc. # 68], at 2 n. 1. Defendant contends that April 30, 1998 (300 days prior to the filing of Plaintiffs' EEOC complaint) is the earliest date from which Plaintiffs can claim discriminatory conduct. The Court disagrees. Plaintiffs' disparate treatment claims arise from their rankings on the rank list. The rank list was not discovered until May 1998. Until that time, Plaintiffs were not aware of the relative rankings of White male and minority FLSs. This is the

classic scenario meriting application of the continuing violation theory. *See Huckabay v. Moore*, 142 F.3d 233, 238–39 (5th Cir.1998) (citing *Messer v. Meno*, 130 F.3d 130, 134–35 (5th Cir.1997)). Accordingly, the relevant time period commences in 1995 (the earliest date from which Exxon has retained ranking and personnel information). Although Plaintiffs contend that the relevant time period commences in 1993, they have produced no evidence of their rankings or salary for 1993 or 1994. The Court will address the evidence presented by the parties for the years 1995 through 2000.

their salaries have been artificially depressed. In response, Defendant contends that Plaintiffs' salaries are determined by their rankings, and that these rankings are the result of a facially neutral, and indeed explicitly anti-discriminatory, process. Plaintiffs have replied with the following types of evidence: (1) evidence that the ranking system allows for SLS racial bias; (2) evidence that Plaintiffs were ranked significantly lower than "similarly situated" White FLSs; (3) statistical evidence purporting to show a "gross disparity" between the rankings of White male FLSs and minority and female FLSs; and (4) evidence of racially charged remarks and incidents involving various SLSs.

## A. *Analytical Framework*

■ Title VII prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). A plaintiff may prove a claim through direct evidence or circumstantial evidence. *See Russell v. McKinney Hospital Venture*, 235 F.3d 219, 222 (5th Cir.2000); *Urbano v. Continental Airlines*, 138 F.3d 204, 206 (5th Cir.1998).

■ "Direct evidence is evidence which, if believed, proves the fact [of intentional discrimination] without inference or presumption." *Brown v. East Mississippi Electric Power Ass'n*, 989 F.2d 858, 861 (5th Cir.1993); *accord Brady v. Ft. Bend County*, 145 F.3d 691, 712 (5th Cir.1998). When a plaintiff presents credible direct evidence that discriminatory animus in part motivated or was a substantial factor in the contested employment action, the burden of proof shifts to the employer to establish by a preponderance of the evidence that the same decision would have

been made regardless of the forbidden factor. *Brown*, 989 F.2d at 861.

■ A plaintiff can also prove a case of race discrimination through circumstantial evidence, using the familiar burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Russell*, 235 F.3d at 222. The plaintiff first must establish a *prima facie* case of race discrimination. The employer must then respond by producing a legitimate, nondiscriminatory rationale for its decision. Once the employer offers a legitimate, non-discriminatory reason for the plaintiff's termination, the burden shifts back to the plaintiff to "raise a genuine issue of material fact as to whether the employer's proffered reason was merely a pretext for [discrimination]." *Medina v. Ramsey Steel Co., Inc.*, 238 F.3d 674, 680 (5th Cir.2001). "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

■ "The ultimate determination, in every case, is whether, viewing all of the evidence in a light most favorable to the plaintiff, a reasonable factfinder could infer discrimination." *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000) (citing *Reeves*, 530 U.S. at 142, 120 S.Ct. 2097). "In making this determination, a court should consider 'the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case....'" *Id.* (citing *Reeves*, 530 U.S. at 148–49, 120 S.Ct. 2097).

### B. *Plaintiffs' Prima Facie Case*

A plaintiff may state a *prima facie* case of race (or sex) discrimination by showing that (1) he was a member of a protected class; (2) he was qualified for the benefit or promotion he sought; (3) that he was denied the benefit or promotion, and (4) that similarly situated employees outside the protected class were treated more favorably (*i.e.,* that the employment decision of which he complains was differentially applied to him). *Rubinstein v. Administrators of Tulane Educ. Fund,* 218 F.3d 392, 399 (5th Cir.2000), *cert. denied,* —— U.S. ——, 121 S.Ct. 1393, 149 L.Ed.2d 316 (2001).

Defendant initially contended that Plaintiffs could not meet the fourth prong of the *prima facie* test because they had no evidence that the ranking process was "differentially applied" to them. *See* Coleman Motion, at 12. Plaintiffs responded, without further explication, that they "did not receive the same salary increases as did similarly or less qualified White employees." Allen, *et al.,* Response, at 27. Plaintiffs later produced a list of White male FLSs that they contend are similarly situated because the PAC evaluations of the White male FLSs contain ratings and comments similar to those contained in Plaintiffs' PAC evaluations. Defendant contends that the specifically identified White male FLSs are not proper comparators, first because most had different supervisors than Plaintiffs and thus the PAC evaluations were filled out by different persons; and, second, because the PAC evaluations constitute *individualized* feedback with little or no bearing on the comparative rankings at issue in this case.

It is well established that a plaintiff may support a claim of disparate treatment by showing that his employer gave "preferential treatment to [another] employee under 'nearly identical' circumstances." *Okoye v. Univ. of Texas Houston Health Sci. Ctr.,* 245 F.3d 507, 514 (5th Cir.2001) (quoting *Little v. Republic Refining Co., Ltd.,* 924 F.2d 93, 97 (5th Cir. 1991)). The "nearly identical" standard, when applied at the *McDonnell Douglas* "third step," the pretext analysis, is a stringent standard. Employees with different responsibilities, different supervisors, different capabilities, different work rule violations or different disciplinary records are not considered to be "nearly identical." *See Okoye,* 245 F.3d at 514–15 (and cases cited therein).

The Fifth Circuit has held that the "nearly identical" standard applies equally to the fourth prong of the *prima facie* case. *See Williams v. Trader Publishing Co.,* 218 F.3d 481, 484 (5th Cir.2000); *Bennett v. Total Minatome Corp.,* 138 F.3d 1053, 1062 (5th Cir.1998); *Mayberry v. Vought Aircraft Co.,* 55 F.3d 1086, 1090 (5th Cir.1995). However, the Fifth Circuit has appeared reluctant to reject discrimination claims by applying the "nearly identical" standard at the *prima facie* stage of the analysis. *See, e.g., Okoye,* 245 F.3d at 513 (assuming, without deciding, that *prima facie* burden was met and deciding case on issue of pretext); *Nieto v. L & H Packing Co.,* 108 F.3d 621, 623 n. 5 (5th Cir.1997) (noting "confusion" in distinguishing between *prima facie* and pretext analyses, and "proceed[ing] directly to the ultimate question [of discrimination]" where "strict application of the burden-shifting framework [was] not particularly helpful").[10]

---

**10.** In contrast, the Seventh Circuit has not hesitated to dismiss employment discrimination claims after analysis of the *prima facie* case "nearly identical" standard for the fourth prong of the test. *See Logan v. Caterpillar, Inc.,* 246 F.3d 912, 919–20 (7th Cir. 2001); *Radue v. Kimberly–Clark Corp.,* 219 F.3d 612, 617–20 (7th Cir.2000).

To the extent Plaintiffs rely primarily on the individually identified comparators, the Court is unpersuaded. The Court's analysis is set forth below in Section III.D.1 (Comparator Evidence).[11] However, given the lack of Fifth Circuit authority addressing in detail employment discrimination claims at the *prima facie* stage for failure to show "nearly identical" circumstances, given the lack of briefing by the parties on this issue, and given the parties' views expressed at oral argument that the entire rank list represents Plaintiffs' proof of their *prima facie* cases, the Court will make no decision as to whether Plaintiffs in fact have met their *prima facie* burden on this theory. The Court's analysis on the second and third steps of the *McDonald Douglas* test resolves this case. Thus, the Court assumes for the summary judgment motions that Plaintiffs have met their *prima facie* burden.

### C. *Defendant's Legitimate, Nondiscriminatory Rationale*

■ Defendant contends that Plaintiffs' rankings, and therefore salary, have not been artificially depressed as a result of racial or gender bias. Instead, Defendants contend that Plaintiffs' rankings are simply the result of Exxon's race and gender neutral ranking process. A detailed description of the ranking process follows.[12]

Defendant has established that during the pertinent years, FLSs have been ranked by SLSs, with review and supervision from human resources and senior management at the plant. *See* Culberson Aff., ¶¶ 23; Lattimer Aff., ¶¶ 5, 11, 14–16; Deposition of Mike Williams (Ex. I to Plaintiffs' Response) ("M. Williams Deposition"), at 35–41, 47–52, 73–74, 77, 87, 101–107. It appears that the SLS group comprises approximately twenty individuals. *See* Ranker–Rankee Matrix (Ex. 47 to McClore Motion); Notes of Meeting, July 28, 1998. While the exact number of SLSs presently at the plant is unclear, in the current group of SLSs, five are African–American. M. Williams Dep., at 16. At least two are female. At the time the 1998 rank list was prepared, two SLSs were African–American. Coleman Aff., ¶ 33.

The ranking process is conducted in several stages.[13] First, the human resources manager holds a "kickoff meeting" for all SLSs. *See* Culberson Aff., ¶ 4; Lattimer Aff., ¶ 5; M. Williams Dep., at 47–48. The kickoff meeting includes a discussion of the procedures and objectives of the ranking process, as well as a question and answer session. The kickoff meeting is the primary means of educating SLSs about the ranking process. M. Williams Dep., at 49–

---

11. Analysis of Plaintiffs' specific comparator evidence necessitates an understanding of Defendant's explanation of ranking process, and thus the Court evaluates this evidence in the third step of the *McDonnell Douglas* rubric.

12. Plaintiff contends that the Culberson Affidavit contains hearsay, speculation, and other statements not made on the basis of her personal knowledge. *See* Coleman/McClore Response, at 18–21. Plaintiff points out that Culberson only arrived at BOP in July 1997 and that she did not attend a rank session until 1999. *Id.* at 19–20. Culberson's testimony is admissible for the purposes of providing a general description of the ranking

process as she knows it from her personal experience and company records. Plaintiffs' objections are considered in connection with the weight to be given this evidence. In any event, Culberson's descriptions are consistent with those provided by Tracy Lattimer and Mike Williams, SLSs who participated in the ranking sessions in the years before 1998 and on whose testimony the Court primarily relies.

13. The process has remained substantially the same since 1995, so the Court describes it in current terms.

51. The human resources manager discusses the seriousness of the activity, as well as the need to be fair and open. The human resources manager also mentions the company's commitment to diversity at the kickoff. *Id.* at 51–52.

Second, each SLS assembles performance evaluation information on the FLSs who report to him. For each of these FLSs, the SLS solicits information from the FLS, as well as from the FLS's "customers," co-workers, subordinates, and/or contractors who have worked with the FLS. The FLS and SLS usually agree on which "customers" should be approached for feedback. In addition, the FLS is given the opportunity to provide a self-evaluation, including accomplishments, goals, training desired or areas for improvement. Once a SLS has finished gathering information, he prepares a summary (a form called a "PS–III") which he discusses with the FLS. Culberson Aff., ¶¶ 5–6; Lattimer Aff., ¶¶ 6–7. As part of the information-gathering process, an SLS may fill out a draft PAC form. Lattimer Aff., ¶ 7.

While the information-gathering process is intended to be highly interactive, it is unclear in practice how much input a FLS has. For instance, McClore contends that he was only rarely asked by his supervisors to provide a list of his accomplishments or other information for the ranking process. McClore Aff., ¶ 13. Indeed, while SLSs were encouraged to fill out PS–III forms, they were not required to do so. *See* Confidential Interoffice Memo

regarding 1999 FLS/Specialist Rank Input, April 23, 1998 (Ex. D to Coleman/McClore Response), at unnumbered first page.

Third, each SLS selects those FLSs he will rank. The SLS ranks those FLSs who report directly to him, as well as any other FLSs with whose work he has familiarity. Lattimer Aff., ¶ 8; M. Williams Dep., at 28–29. The SLS must weigh each ranking he gives a FLS according to his familiarity with the FLS's work using a three-point scale, "1" for a direct supervisory relationship, "2" for a functional or indirect supervisory relationship, and "3" for direct and recurring business contact.[14] *See* Confidential Interoffice Memo regarding 1999 FLS/Specialist Rank Input, at unnumbered fourth page. A SLS's rankings are not counted if he ranks fewer than three FLSs.[15] *Id.* In ranking a FLS who is not a direct report, the SLS may consider the PS–III form or PAC (individualized evaluation) completed by the FLS's direct supervisor. M. Williams Dep., at 54–56.

Once he has decided which FLSs to rank and has assigned a familiarity code to each, the SLS ranks those FLSs from top to bottom according to their performance. Although SLSs are not required to use any particularized criteria in this ranking, they are encouraged to consider the performance dimensions of leadership, communication, safety/health, job knowledge and people development. *See* Confidential Interoffice Memo regarding 1999 FLS/Specialist Rank Input, at unnumbered third page.[16] SLSs Tracy Lattimer and Joe

---

**14.** *See* Ranker–Rankee Matrix. The initials of each SLS are listed across the top of the matrix; the different FLS positions are listed down the side. If the SLS intends to rank a particular FLS, a "1", "2", or "3" is placed in the appropriate box.

**15.** The Ranker–Rankee Matrix provided in Exhibit 47 shows that in one year some SLSs ranked as many as nineteen FLSs.

**16.** Since 1992, human resources has provided a list of FLS performance characteristics for SLSs to consider, although SLSs are not required to use them. M. Williams Dep., at 57–58.

Wolf both state they are generally confident with the relative ranking list they are able to produce through this process. Lattimer Aff., ¶ 9; Affidavit of Joseph Wolf (Ex. E to McClore Motion) ("Wolf Affidavit"), ¶ 13.

Fourth, the individual rank lists prepared by the SLSs are combined according to a computer algorithm. The resulting list, known as the "first pass" rank list, is distributed to all SLSs.

Fifth, all SLSs meet to determine FLS rankings. The session usually lasts a full day and is held outside the plant premises. The session begins with the human resources manager making opening remarks, stressing that the rankers should only consider FLS performance for the preceding year and emphasizing Exxon's policy on equal employment opportunity and nondiscrimination. Culberson Aff., ¶ 10. The human resources manager is present throughout the ranking session. Each SLS may bring the draft PAC or PS–III forms for the FLSs for whom he intends to give input. Lattimer Aff., ¶ 7; M. Williams Dep., at 64. Each FLS is considered in turn. The FLS's direct supervisor generally gives a presentation of the FLS's accomplishments, strengths and weaknesses. The FLS's performance is compared with the performance of those FLSs in the same range on the first pass rank list. If the SLSs cannot differentiate the performance of two or more FLSs, they may elect to "cluster" (*i.e.,* give the same numerical ranking to) those FLSs. *See e.g.,* M. Williams Dep., at 89–90. Because SLSs are aware that quintile rankings affect pay, the discussion is particularly intense when a quintile ranking is at stake. M. Williams Dep., at 115. The process continues until consensus among the SLSs has been reached on the entire rank list. Lattimer Aff., ¶¶ 12–13; M. Williams Dep.,

at 80, 104. The finished product is called the draft rank list.

Sixth, the human resources staff runs "skewing data" on the draft rank list. The skewing data reveals the average ranking for each subgroup of FLSs. Subgroups are created for FLSs working in different departments of the plant, for specialists versus FLSs, and for minorities and females. Skewing data has been generated since at least 1993. M. Williams Dep., at 102.

Seventh, the SLSs meet again to consider the skewing data and to give their opinions of that year's ranking process. At that time, the SLSs may decide to adjust the rankings given the skewing data. However, such adjustments are rare. Lattimer Aff., ¶ 13; M. Williams Dep., at 103. With senior management (*i.e.,* department heads, plant manager and human resources manager) present, SLSs are given the opportunity to express their concerns about aspects of the ranking process or to explain certain ranking decisions. M. Williams Dep., at 106–07. During this process, the human resources manager offers suggestions for improving the following year's ranking process, based on her own perceptions and the feedback gleaned from the SLSs. *Id.* at 35–36.

Finally, members of senior management meet to finalize the rank list. Management may decide to make adjustments to the rank list, but these adjustments are generally small and infrequent. Culberson Aff., ¶ 15.

Defendant contends that the process is inherently inimical to discrimination and contains safeguards to prevent unlawful biases from affecting the outcome. Defendant notes that the process requires inputs from multiple sources as well as vocal debate and explicit justification of ranking decisions among the SLSs. SLSs are reminded throughout the process to consider performance only, to focus on the single

year in issue, and to keep in mind Exxon's commitment to nondiscrimination, which is stressed both at the kickoff and ranking meetings. SLSs are aware that skewing data will be generated showing the relative positions of minority and female FLSs. Defendant contends that the practice of circulating and considering the skewing data, and SLSs' awareness of this practice, increase SLSs' accountability to make non-discriminatory decisions.[17]

The record is uncontradicted that the ranking process is facially neutral. The ranking process protects against *overt* discrimination. Indeed, there is no evidence of a race- or gender-based comment being made during the ranking process. Defendant has thus met its burden to articulate a legitimate reason for the rankings of the Plaintiffs during the years in issue.[18]

The Court next will examine each Plaintiff's individualized evidence of anecdotal disparate treatment or discrimination, as well as Plaintiffs' statistical evidence purporting to show disparities in the salaries of minority FLSs and White male FLSs.[19]

### D. *Plaintiffs' Evidence of Discrimination, Pretext or Falsity*

#### 1. Comparator Evidence

■ As mentioned above, Plaintiffs have submitted a list of so-called "comparators," White male FLSs who were ranked higher than Plaintiffs, and thus allegedly received more favorable treatment. Plaintiffs claim these individuals are "similarly situated" to Plaintiffs.[20]

17. Although Lattimer and Mike Williams state that the rankings are rarely changed as a result of the skewing data, they believe this is because the SLSs have already tried to be as fair and rigorous as possible, *see* Lattimer Aff., ¶ 13, or because the SLSs have already reached consensus as to the rankings overall, *see* M. Williams Dep., at 103–04.

18. The Court nevertheless notes that the ranking process cannot prevent a SLS's racial (or gender) bias from infecting the FLS rankings to some degree *if* that SLS wanted to influence the outcome covertly on that basis. As Plaintiffs note, SLSs have discretion in deciding whom to rank. Although SLSs are given suggested performance criteria, there is no guarantee or documentation that the criteria were used at all or were used consistently, or that Defendant checked these matters each year as the process was underway. The ranking process is largely subjective and there is no written detailed documentation of the criteria each SLS actually used in a particular ranking session. Indeed, Gail Culberson admits that "it would be naive to think that discrimination in ranking is impossible." Culberson Aff., ¶ 20. Given the need for the SLSs generally each to justify orally their positions on each FLS and to do so with reference to specific conduct by the FLS during the prior year, and given that there are at least several SLSs ranking each FLS, it appears to be difficult for a SLS to depress

*substantially* a FLS's rank based on an improper motive.

19. Plaintiffs have submitted the report of Dr. Mary Konovsky, a professor of organizational behavior. *See* Evaluation of Ranking Process (Ex. E to Coleman/McClore Response). Dr. Konovsky discusses various flaws in the ranking process which she contends may contribute to "inaccurate" rankings. *Id.* Defendant has submitted a rebuttal prepared by its own expert in industrial/organizational psychology, Paul Jeanneret, Ph.D. *See* Report, P.R. Jeanneret (Ex. C to Coleman/McClore Reply). The opinions of Dr. Konovsky and Dr. Jeanneret as to the flaws or merits of the ranking system are largely immaterial to the summary judgment analysis since the parties and the Court agree that the ranking system does not *preclude* discrimination.

20. Not all of the cited comparators were paid more than Plaintiffs, although each was ranked higher than the associated Plaintiff. As mentioned above, *see supra* at 3 n. 5, salary appears to be a product of seniority (years as a FLS or specialist) and position (specialist, process FLS, or mechanical FLS) as well as quintile ranking. These additional factors may account for the lower pay of the comparators. In any event, Defendant does not dispute Plaintiffs' equating a higher ranking with "more favorable treatment."

Plaintiffs contend the comparators are similarly situated because the comparators' PAC evaluations contain comments and ratings similar to those contained in Plaintiffs' PAC evaluations. *See generally* Comparator List.

Defendant first contends that the comparisons are meaningless if a Plaintiff and his or her purported comparator did not have the same supervisor. For instance, Plaintiff Allen contends that she was "similarly situated" to six White male FLSs, all of whom were ranked above her for the years 1995 through 1998. However, as Defendant points out, none of these comparators had the same supervisor as Allen in any given year. *See* Comparator's Supervisors (Ex. B to Final Submission). The same is true for the comparators produced by Plaintiffs Coleman, Owens, Sloan, and Williams.[21] *Id.*

The fact that a similarly situated individual outside a Plaintiff's protected class was treated more favorably than that Plaintiff may constitute probative evidence of disparate treatment. However, the more favored treatment must have occurred under "nearly identical" circumstances. Where the comparator and the Plaintiff have different supervisors, their situations are not "nearly identical." *Okoye*, 245 F.3d at 514; *Little*, 924 F.2d at 97. Accordingly, Allen, Coleman, Owens, Sloan and Williams have

failed to produce specific probative comparator evidence.

The other two Plaintiffs, respectively, have identified at least some comparators who had the same supervisor as the Plaintiff. For instance, Carl McClore compares himself to Doug Olin, who had the same supervisor as McClore in 1998.[22] Reginald Carter compares himself to Harvey Moore and Alan Tingle. Carter, Moore and Tingle had the same supervisor in 1995 and 1996.[23]

Defendant objects to this comparative evidence because it is manifestly incomplete and because the PACs are used primarily for a counseling function, which is materially different from the comparative ranking process under challenge. The Court agrees that this comparator evidence based on PACs is materially incomplete, and has minimal, if any, probative value.[24]

■■■ First, this comparator evidence, insofar as it is designed to show substantial similarity of circumstances with Plaintiffs in the ranking process and thus to serve as circumstantial evidence of falsity or pretext in Defendant's explanation of its ranking process, the evidence misses the mark. While a FLS's direct supervisor may play a large part in the rank that the FLS achieves, each FLS is ranked by various SLSs in preparation for the ranking session. *See supra* at 14—17. The

---

**21.** Tony Williams compares himself to Rex Adams, who had the same supervisor as Williams in 1997. However, Williams deferred his PAC for 1997. *See* Comparator List, at 28.

**22.** Olin also had the same supervisor as McClore in 1995, 1996, and 1997, and Scott Brownfield had the same supervisor as McClore in 1995. However, because McClore deferred his PAC evaluations for 1995, 1996, and 1997, it is impossible to compare his performance to Olin's or Brownfield's during those years.

**23.** Carter and Tingle also had the same supervisor in 1997, but Carter deferred his PAC evaluation for that year. Thus, there is no evidence that permits Carter's performance to be compared to Tingle's during 1997.

**24.** Even assuming that Plaintiffs' basis of comparison (*i.e.*, ratings and comments on PAC forms) is valid, it appears that McClore and Carter received worse ratings than their comparators. *See* Comparator List, at 16, 19.

evidence does not reveal which SLSs' rankings had a material effect on a Plaintiff's ultimate rank in any year. It is impossible to tell which SLSs ranked particular FLSs, how many SLSs ranked each of the Plaintiffs or their respective purported comparators, whether the same SLSs ranked a Plaintiff and his purported comparators, or how a Plaintiff fared against his comparators in those SLSs' initial rankings.[25] A single PAC evaluation by one supervisor, standing alone, is merely an isolated piece of evidence singularly unhelpful in showing that SLSs as a group—in the ranking process—discriminated against a Plaintiff.[26]

Plaintiffs' efforts to establish "substantial similarity" between themselves and particular comparators, based on comments on a single PAC form, even forms about two FLSs written by one SLS, are also impeded by the nature and purpose of the PACs. The PAC form consists of a list of performance categories in which the FLS must be rated within three simple categories, "better" than, "similar to," or "below" most other FLSs. The SLS is provided limited space to make substantive comments. The PAC form thus inherently limits the SLS's description of the deficiencies or positive aspects of a FLS's performance. SLS Tracy Lattimer states,

[A]lthough I and other SLSs receive a lot of training in filling out the individual performance evaluation (PAC) during various management courses we take at Exxon, I feel more confident in my ability to rank individuals competitively than to put into words a description of the quality of their performance on a PAC form.... [To] me it is more straightforward and objective to competitively rank the overall contribution of two individuals than it is to describe them separately and qualitatively.

Lattimer Aff., ¶ 9. SLS Joe Wolf also notes his confidence in constructing a relative ranking for the four FLSs reporting to him. Wolf Aff., ¶ 13.[27] Plaintiffs have not produced the testimony of any SLSs who contradict these assessments.

The PAC forms constitute a performance *counseling.* Although Plaintiffs characterize the comments they have isolated from individual PAC forms as "articulated reasons for low ranking," *see* Comparator List, *passim,* the PAC comments are merely suggestions for improvement. The PAC forms are prepared by FLSs' direct supervisors. In the years on which Plaintiffs focus (1995–98), a PAC form did not necessarily reflect the views of SLSs or their third party sources of information, other than the FLS's direct supervisor. In any event, not surprisingly, many FLSs

---

**25.** The Court recognizes that Plaintiffs have been handicapped in this regard due to the absence of documentation from Defendant during the ranking process. However, Defendant contends that there is no need to retain this documentation because the initial rankings inevitably are altered by the consensus after debate among the SLSs. The Court is not permitted to second-guess the methodology used by an employer. *Walton v. Bisco Industries, Inc.,* 119 F.3d 368, 372 (5th Cir.1997) (citation omitted); *accord Deines v. Texas Dept. of Protective Serv.,* 164 F.3d 277, 281 (5th Cir.1999). Defendant's practices as to record keeping, or lack thereof, appear to predate this litigation and Plaintiffs' claims.

**26.** The testimony of Plaintiffs' own expert Mary Konovsky undercuts Plaintiffs' reliance on comments in the PACs. Konovsky remarks on the "independence of the ranking process and the PAC process." Konovsky Report, at 2. Konovsky concluded that "the information provided [on individual evaluations] did not significantly influence the ranking process." *Id.*

**27.** Wolf directly supervised McClore and his purported comparator Doug Olin in 1999. Wolf believed that McClore was "competitively not close" to Olin. *Id.*

have the same or similar suggested areas of improvement (*e.g.*, better communication skills, increased initiative). As Defendant points out, even the two highest ranked FLSs' PAC forms contain these bromides. *See* Redacted PAC forms (Ex. D to Final Submission). The fact that two differently ranked FLSs had the same recommended area for improvement says nothing about the *degree* of the perceived problem or the relative importance of the identified area to each FLS's particular job duties. Two FLSs' receipt of one, or even several, similar characterizations of areas for improvement· in a given year, therefore, does not mean that they actually are in "nearly identical" circumstances.

■ Similarly, purported comparators identified in Plaintiffs' affidavits based on anecdotal evidence cannot be considered "similarly situated" or "nearly identical" to the Plaintiffs.[28] Plaintiffs' attempts to compare their rankings to those of White FLSs who appear to have had the same performance issues as Plaintiffs, or who worked on the ·same projects or committees as Plaintiffs, ultimately are unavailing in light of the holistic evaluation of each FLS's performance by multiple sources which takes place at the ranking sessions. Plaintiffs have submitted no evidence that the issues they point to were dispositive in the rankings.

■ Finally, Plaintiffs' personal, subjective views of their own performance are not probative evidence of falsity or pretext in this case. Several Plaintiffs in their affidavits attempt to rebut the suggestions for improvement listed in their PACs. *See* McClore Aff., ¶ 12; Affidavit of Charlotte Allen (Ex. A to Allen, *et al.*, Response) ("Second Allen Affidavit"), ¶¶ 6, 7; Carter Aff., ¶¶ 7, 8, 11–14; Owens Aff., ¶ 16; Sloan Aff., ¶¶ 14–15. The failure of this evidence lies not in its "subjective" nature *per se*,[29] but in the fact that the suggestions for improvement listed in the PACs

---

28. *See* Coleman Aff., ¶ 22 (comparing himself to White male FLSs who worked on the same projects he did); McClore Aff., ¶¶ 10–11 (comparing himself to White male FLSs who were known to have temper/communication issues); Affidavit of Charlotte Allen (Ex. A to Coleman/McClore Response) ("First Allen Affidavit"), ¶ 8 (citing White male FLSs who worked on the same projects she did); Affidavit of Reginald Carter (Ex. C to Allen, *et al.* Response) ("Carter Affidavit"), ¶ 10 (comparing himself to White male FLSs who he contends have not done as much committee work); Affidavit of Tony Williams (Ex. E to Allen, *et al.*, Response) ("T. Williams Affidavit"), ¶ 11 (comparing himself to White male FLSs who worked on the same project as he did); Affidavit of Gaines Owens (Ex. B to Allen *et al.*, Response) ("Owens Affidavit"), ¶ 18 (comparing himself to White FLSs who he contends do not take safety issues seriously); Sloan Aff., ¶¶ 5, 14 (comparing himself to a White male FLS he contends has a "condescending" personal style).

29. *See Evans v. City of Bishop*, 238 F.3d 586, 590 n. 7 (5th Cir.2000) (citing *Portis v. First Nat'l Bank*, 34 F.3d 325, 329 n. 10 (5th Cir. 1994) ("the 'fact that [the plaintiff's] case-in-chief consists solely of [his] own testimony does not prevent [him] from establishing intentional discrimination' ")). However, a plaintiff's testimony regarding his opinions of his qualifications and work performance cannot be speculative or conclusory. *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 42 (5th Cir.1996) (plaintiff's testimony that he was better qualified than his replacement may produce genuine issue of material fact as long as testimony is "sufficiently specific" and not "mere subjective speculation"); *accord Scott v. Univ. of Mississippi*, 148 F.3d 493, 508 (5th Cir.1998), *abrogated on other grounds by Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000). In addition, "mere acceptance of an employee's favorable assessment of his own qualifications generally cannot permit a factfinder to conclude that an employer's reasons for a challenged employment action are pretextual." *Boehms v. Crowell*, 139 F.3d 452, 459 (5th Cir.1998).

cannot be equated with "articulated reasons for low ranking."[30] .

In summary, Plaintiffs have attempted to show that performance criticisms they received on PACs were pretextual, by identifying White male FLSs who received the same criticisms but were higher-ranked; or that the performance criticisms were false, by affidavit testimony regarding their own perceptions of the fairness of the criticisms. As discussed above, there are several flaws in Plaintiffs' evidence. The suggestions for improvement contained in the PACs are not Defendant's "articulated reasons" for a Plaintiff's ranking. A PAC form represents only the opinions of the SLS filling out the form, whereas a FLS is ranked by several SLSs at the ranking session. For these reasons, Plaintiffs' comparator evidence fails to raise a fact issue as to pretext or falsity for any Plaintiff.

### 2. Statistical Evidence

### a. *Applicable Legal Standard*

■ Plaintiffs rely heavily on statistical evidence they have submitted purporting to show a gross disparity between the pay of minority FLSs and White FLSs. A plaintiff may raise an inference of discrimination—*i.e.,* prove a *prima facie* case—if gross statistical disparities are shown in the analysis of pertinent data. *EEOC v. American Airlines, Inc.,* 48 F.3d 164, 173 n. 9 (5th Cir.1995); *Anderson v. Douglas & Lomason Co., Inc.,* 26 F.3d 1277, 1290 (5th Cir.1994). A showing of gross statistical disparity requires a statistical difference of at least two standard deviations. *Anderson,* 26 F.3d at 1292; *Lopez v. Laborers Int'l Union Local # 18,* 987 F.2d 1210, 1214 (5th Cir.1993) (difference greater than three standard deviations is *prima facie* proof that the selection system is not random); *Frazier v. Garrison Indep. School Dist.,* 980 F.2d 1514, 1524 n. 29 (5th Cir.1993). A difference of two standard deviations is roughly equivalent to a .05 level of statistical significance. *Kadas v. MCI Systemhouse Corp.,* 255 F.3d 359, 361–62 (7th Cir.2001).

■ Plaintiffs have offered their statistical analysis as evidence of pretext, not to meet their *prima facie* burden. *See* Coleman/McClore Response, at 21. However, "[w]hile statistical evidence 'may be probative of pretext in limited circumstances,' it 'usually cannot rebut the employer's articulated nondiscriminatory reasons.'" *Scott v. Univ. of Mississippi,* 148 F.3d 493, 510 (5th Cir.1998), *abrogated on other grounds, Kimel v. Florida Bd. of Regents,* 528 U.S. 62, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000) (quoting *EEOC v. Texas Instruments, Inc.,* 100 F.3d 1173 (5th Cir.1996)).[31] Sta-

---

**30.** One Plaintiff, Gaines Owens, attempts to refute the "most often quoted reason" for his low rank. Owens Aff., ¶ 27. Owens states that the reason given for his low rank was his "low visibility," and he contends that his "visibility is not low." *Id.* Owens does not specify who told him his "low visibility" was a problem, when this statement was made, or what ranking it affected. He also does not elaborate on the reasons for his belief that his visibility was not low. Therefore, Owens' affidavit testimony does not create a fact issue as to falsity or pretext.

**31.** *Sreeram v. Louisiana State Univ.,* 188 F.3d 314 (5th Cir.1999), illustrates the difficulty of

successfully using statistics at the pretext stage. In *Sreeram,* the plaintiff (Sreeram) complained that she had suffered sex and national origin discrimination when she was terminated from her surgical residency program. Sreeram attempted to introduce statistical evidence to show that over the past ten years, only two out of 99 residents who completed the program were women. *Id.* at 320. The court rejected the evidence as unpersuasive because a female resident completed the program the year the plaintiff was terminated. *Id.* at 321. Similarly, in the instant case, Plaintiffs have difficulty showing intentional discrimination in the ranking system because

tistics "standing alone [are] not likely to establish a case of individual disparate treatment.... To establish disparate treatment, the statistics must be accompanied by other evidence." *Rummery v. Illinois Bell Telephone Co.*, 250 F.3d 553, 559 (7th Cir.2001); *Deloach v. Delchamps, Inc.*, 897 F.2d 815, 820 (5th Cir.1990).

### b. *Analysis of Plaintiff's Statistical Evidence*

 For the reasons discussed below, the Court concludes that Plaintiffs' statistical evidence suffers from serious methodological flaws, and is therefore inadmissible under Rule 702 of the Federal Rules of Evidence and the standards for expert testimony under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), *Kumho Tire Co. v. Carmichael*, 526

U.S. 137, 156–57, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), and their Fifth Circuit progeny.[32]

In order to test the hypothesis that Plaintiffs suffered discrimination resulting in pay lower than that received by White male FLSs, Plaintiffs' statistician Ronald Luke performed a regression analysis. *See* Report of Ronald T. Luke, Ph.D., J.D. (Ex. F to Coleman/McClore Response) ("Luke Report"). Luke attempts to determine the extent to which the independent variables of minority status and tenure (*i.e.*, years worked at Exxon) influenced the dependent variable of salary for the years 1995 to 2000. Luke concludes that there was a statistically significant difference between the salaries of minority FLSs and White male FLSs. Luke Report, at 2–3.[33] Plaintiffs have also submitted the

---

of the high ranking of Emile Viola, an African–American male. In every year but one from 1995 to 2000, Viola is the highest or second-highest ranked FLS.

**32.** Rule 702 of the Federal Rules of Evidence, as effective since December 1, 2000 provides:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to the facts of the case.

Rule 702 "imposes a special obligation upon a trial judge to ensure that any and all [expert] testimony ... is not only relevant, but reliable." *Rodriguez v. Riddell Sports, Inc.*, 242 F.3d 567, 580–81 (5th Cir.2001) (citing *Kumho Tire*, 526 U.S. at 147, 119 S.Ct. 1167). The proponent of the expert testimony "must prove by a preponderance of the evidence that the testimony is reliable." *Rodriguez*, 242 F.3d at 581 (citing *Tanner v. Westbrook*, 174 F.3d 542, 547 (5th Cir.1999)). "Both the

determination of reliability itself and the factors taken into account are left to the discretion of the district court consistent with its gatekeeping function under FED. R. EVID. 702." *Munoz v. Orr*, 200 F.3d 291, 301 (5th Cir.2000), *cert. denied*, 531 U.S. 812, 121 S.Ct. 45, 148 L.Ed.2d 15 (2000) (upholding district court's exclusion of plaintiff's statistical expert in disparate impact case).

**33.** In concluding that there was a statistically significant disparity between the salaries of minority FLSs and White male FLSs, Luke apparently "pooled" the data for the years 1995 to 2000. Assuming BOP had a static population of 50 FLSs for the years 1995–2000, Luke made a single calculation encompassing all 300 "observations." Luke Report, at 2–3. In order to create this larger pool (as opposed to performing separate calculations for each year), Luke had to assume that every FLS's rank each year was entirely independent from the prior year's rank. *See* Coleman/McClore Sur–Reply. Defendant argues that this assumption is incorrect, both factually and from a statistical theoretical standpoint. The Court agrees. An event is independent when "the occurrence or nonoccurrence of one event has no effect on the probability of occurrence of the other event." Leonard J. Kazmier, THEORY AND PROB-

Affidavit of John F. Scoggins (Ex. A to Coleman/McClore Sur–Reply) ("Scoggins Affidavit"). Scoggins' analysis purports to show there is a statistically significant difference between the salaries of minority and White male FLSs in each year from 1995–1999, even when the data are not pooled. *See* Scoggins Aff., at 3–4.

Defendant has introduced evidence from its own expert, Dwight Steward, who criticizes several fundamental assumptions on which Plaintiffs' statistical evidence is based. *See* Affidavit of Dwight Steward (Ex. E to Coleman/McClore Reply) ("Steward Affidavit"); Second Affidavit of Dwight Steward (Ex. C to Final Submission) ("Second Steward Affidavit"). First, Steward contends that the sample size is too small to be meaningful. Second, Steward contends that Luke and Scoggins erred in comparing White male FLSs to "minority" (African–American, Hispanic and White female) FLSs. Third, Steward contends that Luke and Scoggins' variable for "tenure" is flawed and/or irrelevant.

*Sample Size* Between 1995 and 2000, the FLS population at BOP ranged between forty-one and fifty-one individuals. *See* Redacted Rank Lists. In any given year, there were between eight and ten African–American FLSs. *Id.*

■ "Whether a sample is too small to yield meaningful results is a determination made by the district court on a case-by-case basis." *Anderson,* 26 F.3d at 1289 n. 20. The Fifth Circuit has cautioned against the use of statistics involving small sample sizes. "The reason for [the] hesitance is obvious: 'the smaller the sample size, the greater the likelihood that the underrepresentation reflects chance rather than discriminatory practices.'" *Stendebach v. CPC Int'l, Inc.,* 691 F.2d 735, 738 (5th Cir.1982) (citing *Williams v. Tallahassee Motors, Inc.,* 607 F.2d 689, 693 (5th Cir. 1979)).

In the instant case, the sample sizes, especially those for African–American FLSs, are quite small. The Court does not hold that these sample sizes are insufficient as a matter of law; however, any statistical analysis derived from such a small universe is far from conclusive and must be subjected to close scrutiny for reliability.[34]

■ *Inclusion of Hispanic Males and White Females in Protected Group.–* Plaintiffs rely on a comparison of the salaries of White male FLSs to those of so-called "minority" FLSs, which Plaintiffs define as African–American, Hispanic *and* White female FLSs, collectively. *See* Luke Report, at 1. Defendant contends this methodology is improper because "historical experiences concerning discrimination have differed by race and gender." Steward Aff., ¶ 8. More pertinently, at oral

LEMS OF BUSINESS STATISTICS, 68 (McGraw–Hill 1988). As a matter of common sense, and practice at BOP, an employee's performance each year has some relationship to the prior year's performance. *See also* M. Williams Dep., at 79 (noting that the rankings are "clamped" so that a FLS can move no more than fifteen points from one year to the next). This methodological flaw in Luke's analysis renders Luke's pooling analysis unreliable and thus inadmissible.

**34.** An illustration of the lack of reliability of Plaintiffs' statistical data due to the small sample size is the change in average salary for African–American FLSs effected by the inclusion or exclusion of FLS Michael Leverett. Leverett, who is African–American, was ranked 13 in 1996; 11 in 1997; and 1 in 1998. As SLS Tracy Lattimer explains, due to illness, between April 1995 and July 1997 Leverett was absent on approximately 385 out of 572 work days. Leverett took early medical retirement in July 1997. *See* Lattimer Aff., ¶ 20. If Leverett's ranking is omitted from the 1996, 1997 and 1998 rank lists, the average salary for African–American FLSs rises noticeably.

argument Defendant contended that in a race discrimination claim, it is invalid and illogical to include Hispanics and White females along with African–Americans because both Hispanics and White females are outside the protected class. The Court agrees with this latter analysis. All Plaintiffs contend they have suffered discrimination because they are African–American. Therefore, both Hispanics and White females, as individuals outside the protected class in this case, could be comparators and their more favorable treatment could constitute evidence of disparate treatment of African–Americans. Indeed, Plaintiffs implicitly concede this point when they contend that FLS Robert Araujo, a Hispanic male, is a comparator for Charlotte Allen. *See* Comparator List, at 2–3.

To support their race discrimination claim, Plaintiffs must rely on data concerning only African–American FLSs. The proper comparison is between African–American FLSs and non-Hispanic White males.[35]

■ Plaintiffs have offered *no* evidence of a gross statistical disparity between African–American FLS salaries and non-Hispanic White male FLS salaries. Indeed, Scoggins himself notes that the disparity in salary for African–Americans is "never quite statistically significant" for any year between 1995 and 2000. Scoggins Aff., at 5. Defendant's expert Steward reaches the same conclusion. Steward has produced the following table, which compares the average salaries of African–American FLSs and non-Hispanic White male FLSs:[36]

| | African–American | White Male | | Standard |
| Year | FLSs | FLSs | Ratio | Deviations |
| 1995 | $67,300 | $70,900 | 94.9% | 1.32 |
| 1996 | $66,580 | $71,841 | 92.7% | 1.93 |
| 1997 | $68,722 | $72,043 | 95.4% | 1.31 |
| 1998 | $70,133 | $72,947 | 96.1% | 1.06 |
| 1999 | $73,088 | $75,254 | 97.1% | 0.89 |
| 2000 | $74,522 | $74,484 | 100.1% | 0.02 |

*See* Table C to Second Steward Aff.[37] Ac-

cording to Steward, there was no "gross

**35.** At oral argument, Defendant agreed to compare African–American FLS salaries to the salaries of non-Hispanic White male FLSs, as opposed to the salaries of all non-African-American FLSs. This comparison is more favorable to Plaintiffs than the one Defendant initially proposed, *i.e.,* African–American FLS salaries compared to all FLSs' salaries.

**36.** Steward's table does not account for other factors which determine salary, namely, tenure and position. Steward states that simple averages provide a good starting point to determine if further (regression) analysis is necessary. Second Steward Aff., ¶ 17. Steward contends that the averages represented in his table are so close that it was obvious to him

that there were no gross statistical disparities, and a full regression analysis was unnecessary. *Id.*

**37.** Scoggins also calculated the average salaries for African–American FLSs and White male FLSs. For each year and for both groups, his calculations show *higher* average salaries than those calculated by Steward. *See* Scoggins Aff., at 2. Since Plaintiffs did not present any percentage calculations based on their salary data, the Court calculated the ratio of African–American FLSs' salaries to White male FLSs' salaries from Plaintiffs' figures. Scoggins' figures show that in 1995, African–American FLS salaries totaled 96.2% of White male FLS salaries; in 1996, 94.7%; in 1997, 96.9%; in 1998, 96.7%; in 1999,

disparity" (*i.e.*, a difference of at least two standard deviations) between the salaries of African–American and White male FLSs in *any* year under study.

It appears that Plaintiffs' experts were only able to obtain a statistically significant finding by including with African–American data salaries of Hispanic FLSs and White female FLSs. *See* Scoggins Aff., at 5. Average female FLS salaries at BOP are significantly lower than average White male FLS salaries *and* average African–American FLS salaries. *See* Scoggins Aff., at 2.[38] As the Court has held above, however, the comparatively low salaries of Hispanic and White female FLSs do not aid Plaintiffs in their claim for discrimination on account of their race, African–American.[39]

Plaintiffs' statistics accordingly fail to show a "gross disparity" in the treatment of African–American FLSs and White male FLSs.

*"Tenure" Variable.* In their regression analyses, Plaintiffs' experts Luke and Scoggins include a variable for each employee's total number of years at Exxon. Defendant contends this tenure variable is factually unfounded and thus improper. The Court finds that Plaintiffs' experts have based their calculations on an assumption not supported by the record.

According to BOP Human Resources Manager Gail Culberson, salary "factors in years of experience *as a first line or specialist* then the quintile." Culberson Dep., at 113 (emphasis added).[40] Plaintiffs have produced no evidence to the contrary. Thus, Luke and Scoggins should have differentiated between years worked before the employee was promoted to FLS and the years after promotion to FLS. Plaintiffs' experts' failure to use each FLS's years of seniority *as a FLS* creates further unreliability in Plaintiffs' experts' methodology.

*Statistical Evidence Conclusion.* Plaintiffs' statistical analysis suffers from several serious methodological flaws. Fundamentally, Plaintiffs' analysis is premised on assumptions that are not supported by the summary judgment record, are illogical or are contrary to applicable legal doctrine. It is improper for Plaintiffs' experts to compare non-Hispanic White males to an aggregate group of "minority" (African–American, Hispanic, and White female) FLSs in a case in which all Plaintiffs claim discrimination on the basis of their race. It is also unwarranted for Plaintiffs' experts to assume that a FLS's seniority for salary purposes included all years worked at Exxon, as opposed to only those years as a FLS. Plaintiffs' experts' putative statistically significant

96.4%; and in 2000, 97.1%. It appears that none of these results demonstrates a statistically significant difference between African–American and non-Hispanic White male salaries. *See* also Scoggins Aff., at 5.

**38.** In 1995, female FLS salaries were 86.6% of White male FLS salaries; in 1996, 86.1%; in 1997, 88.6%; in 1998, 85%; in 1999, 86%; and in 2000, 87.7%. Again, these are the Court's calculations, using the figures supplied in the Scoggins Affidavit.

**39.** Plaintiff Charlotte Allen pursues a claim of sex discrimination. However, given the extremely small number of female FLSs at BOP

(no more than four on the 1996–1999 rank lists, *see* Redacted Rank Lists), any statistical analysis purporting to show disparate treatment of female FLSs is entirely unreliable.

**40.** Culberson also notes that there are different salary bands for specialists, FLSs who work in the "process" end of BOP, and FLSs who work in the "mechanical" end of BOP. Culberson Dep., at 113. It is unclear how these different salary bands work in conjunction with seniority and rank, and Defendant has not argued that Luke and Scoggins should have accounted for these different salary bands in their analysis.

finding is derived only by using unreliable methodologies. Thus, Plaintiffs' statistical evidence is inadmissible under FED. R. EVID. 702 to show a gross disparity between the salaries of African–American and non-Hispanic White male FLSs. Moreover, if the appropriate comparison is made, *i.e.*, between African–American FLSs and non-Hispanic White male FLSs, using Plaintiffs' own raw data, the data fail to reveal a disparity of at least two standard deviations, and thus Plaintiffs fail to satisfy through their statistical evidence their summary judgment burden to show a "gross disparity" between Defendant's treatment of members of the protected class and the favored group.

### 3. Racial Comments and Incidents

Plaintiffs have submitted evidence (and a summary) of racial comments made by various employees at BOP and principally rely on these matters as direct evidence of Defendant's discriminatory intent. *See* Racial Comments Brief. In addition, each Plaintiff's affidavit contains a list of incidents involving SLSs which Plaintiffs contend are racially charged.

▆▆▆▆ A supervisor's repeated use of racial epithets may constitute direct evidence that a contested employment decision was motivated by racial animus. *Reeves*, 530 U.S. at 151, 120 S.Ct. 2097; *Brown v. East Mississippi Electric Power Ass'n*, 989 F.2d at 861–62. Remarks may serve as evidence of race (or sex) discrimination if they are (1) race or sex related, (2) proximate in time to the employment decision, (3) made by an individual with authority over the employment decision at issue, and (4) related to the employment decision. *Medina v. Ramsey Steel Co., Inc.*, 238 F.3d 674, 683 (5th Cir.2001); *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 655–56 (5th Cir.1996). While the remarks need not be made in the "direct context" of the employment decision, *see Russell*, 235 F.3d at 226 (citing *Reeves*, 530 U.S. at 152, 120 S.Ct. 2097), "[c]omments that are 'vague and remote in time' are insufficient to establish discrimination." *Brown*, 82 F.3d at 655–56 (internal citation omitted); *Russell*, 235 F.3d at 229 n. 19 ("remarks that the plaintiff wholly failed to tie to any potentially relevant time frame" could not constitute evidence of pretext sufficient to defeat summary judgment); *see also EEOC v. Texas Instruments, Inc.*, 100 F.3d 1173, 1181 (5th Cir.1996) (remarks must be "direct and unambiguous").

#### a. *Ed Coleman*

Coleman was supervised by the following SLSs during the period for which evidence has been submitted: Mark Cardinal, 1995[41]; Mark Stephens, 1995–97; Mark Cardinal, 1997–98; and Alex Mott, 1998 to the present. Coleman does not contend that Alex Mott is racially biased against him.[42] However, Coleman believes that both Mark Cardinal and Mark Stephens discriminated against him in various ways between at least 1995 and 1998.

▆▆▆▆ Coleman states that in 1997, Bob Metzger, a SLS and "respected member of Exxon's management team," told him that Cardinal and Stephens were "messing with him" and that they had attempted to move him as far down the rankings as they could. Coleman Aff., ¶¶ 14, 16. However,

---

**41.** Cardinal supervised Coleman from 1992 through 1995.

**42.** Coleman began a temporary assignment to contracts administration in 1997. The move was finalized in 1999. Culberson Aff., ¶ 36. In 1999, Coleman also received a promotion to senior contracts administrator. *Id.* Coleman contends that these 1999 occurrences, and the concomitant salary increases he received, only occurred as a result of filing the EEOC complaint. Coleman Aff., ¶¶ 23, 25.

Coleman has no evidence to show that even if Cardinal and Stephens were "messing with him," it was on account of his race.[43]

■ Coleman contends that on one occasion Cardinal went out of his way to obtain negative feedback on Coleman's performance. Coleman Aff., ¶ 17; Coleman Dep., at 75–85. However, the incidents Coleman recounts do not evince a racially hostile attitude.[44] In any event, in his deposition, Coleman admitted that he has no basis to contend that Cardinal solicited negative information *because of his race* and not in the exercise of appropriate supervisory inquiry as mandated by the ranking process and ordinary management practices. Nor is there any evidence that these were steps taken as to Coleman alone. *Id.* at 84–85.

Coleman also states that Cardinal discounted his opinions because he was Black. Coleman Aff., ¶¶ 17–19.[45] However, Coleman has produced no evidence from Cardinal or from any other person, or objective facts to permit the inference of racial bias in Cardinal's decisions. Rather, Coleman's descriptions reveal Cardinal's and Cole-

man's legitimate differences of opinion on several management decisions. Plaintiff's conclusory, subjective belief that he has suffered discrimination by Cardinal is not probative of unlawful racial animus. *Auguster v. Vermilion Parish School Board.,* 249 F.3d 400, 403 (5th Cir.2001).

■ Coleman also contends that, in 1993, Cardinal made a racially charged remark. Specifically, Coleman describes a discussion regarding racial diversity and an article entitled, "White Privileges," that apparently discussed "the privileges that Whites had in this society because of racism." Coleman Aff., ¶ 20. According to Coleman, Cardinal did not agree with the article, "blamed the efforts to end racism as something that would hurt his children's opportunities," and allegedly stated that he almost hated that his children were born White. *Id.* Cardinal's remarks appear to be opposition to affirmative action, which position *per se* does not equate with racial bias. Further, Cardinal's remarks, as recounted by Coleman, are too ambiguous to support a reasonable inference of racial bias against Coleman in job-related deci-

**43.** In his deposition, Coleman also notes that at the time Metzger gave Coleman this information, Metzger was disgruntled with plant management, having received a *de facto* demotion. Deposition of Ed Coleman (Ex. B to Coleman Motion) ("Coleman Deposition"), at 120–21.

**44.** Specifically, Coleman states that he and Cardinal had agreed on the "customers" who would give Cardinal feedback on Coleman's work performance. Some of the customers did not respond, and Cardinal substituted other customers without discussing the matter with Coleman. Coleman Dep., at 77. From his deposition, Coleman's primary complaint appears to be the fact that Cardinal did not consult him about who else to survey for feedback. *Id.* at 77–78. Coleman admits he does not know if Cardinal was "out to get him" or if Cardinal merely thought that nega-

tive input was a necessary part of a full evaluation. *Id.* at 81.

**45.** Coleman recounts two incidents in which Cardinal accepted the suggestions of White FLSs over those of Coleman. However, there is nothing in Coleman's description of these incidents that would give rise to a reasonable inference that Cardinal discriminated against Coleman because he is African–American. Indeed, after one of the incidents (which concerned filling a particular technician position and occurred while Cardinal was relatively new to his SLS position), Cardinal apparently later apologized to Coleman for not taking his advice. Coleman Dep., at 62–68. Coleman states that in a "dispute [between] a White man and an African American, [Cardinal] could not bring himself to decide in favor of my recommendation." *Id.,* ¶ 18.

sions.[46]

■ In addition, Coleman states that two individuals at the plant said the word "nigger" in his presence. Coleman Aff., ¶ 31. However, these epithets were uttered in 1981 and 1985, *see* Racial Comments Brief, one by an individual who retired in 1984 (and therefore had no influence on the ranking process during the time period relevant to this case), and one by an individual not a SLS. *See* Second Affidavit of Jo Kay Morreale (Ex. A to Final Submission) ("Second Morreale Affidavit"), ¶ 8. Thus, this evidence is not material to Coleman's claims.

■ Finally, Coleman states that the two African–American SLSs who participated in the 1998 rankings, Mike Williams and Melvin Parker, told him they felt that race played a part in the rankings. Coleman Aff., ¶ 33. These comments, while potentially significant, sound only in speculation as recounted. There is no evidence in the record that establishes the reason or the circumstances of Parker's comment, or that fleshes out Parker's view. As described, Parker's alleged comment was merely a thought, without reference to any particular FLS or any indication as to the impact on the ranking results. As to Williams, in his deposition, Williams testified that race plays a part in the rankings only because people "can't leave [their] biases at the door always." M. Williams Dep., at 125. However, Williams clarified, "I think there's an—there's an effort to try and control [individual biases] with the checks and balances

that we have in place with the management involvement ... but I'm not in an individual's head when they're making their choices, so I can't say one way or not." *Id.* Williams's personal belief that race influences the rankings is grounded on his assumptions about society, but he has no specific examples of inappropriate comments or silences by SLSs at the ranking session. An African–American supervisor's philosophical generalizations about race relations is too speculative to serve as probative evidence of discrimination against a particular employee.

The incidents or remarks on which Coleman relies do not constitute probative evidence sufficient to support a verdict in Plaintiff's favor for race discrimination by the SLSs who participated in his rankings. Nor has Coleman adduced probative evidence of falsity of Defendant's explanation of the rankings, which is a legitimate explanation for Coleman's rank and salary for the years Plaintiffs' claim are in issue, 1995–1998.

#### b. *Carl McClore*

From 1995 until the present time, McClore has been supervised by SLSs John Mabry, 1995–97; Rob Peplinski, 1997–98; and Joe Wolf, 1999 to the present. McClore characterizes his working relationships with his supervisors as "amicable" and "very good." McClore Dep., at 30–31. Although McClore does not believe that his last three supervisors bore him any racial animus, he does contend that earlier supervisors treated him less well than his White co-workers.

---

46. Coleman does not argue explicitly that Cardinal's statement about his children meant that Cardinal resented African–Americans competing with Whites on equal footing at BOP, or in FLS ranks. There is no evidence in the record to support such an interpretation, or other unambiguous proof of Cardinal's bias. Indeed, Coleman's highest rank-

ing (79) in the record was awarded in 1996, presumably for work in 1995, for which period Cardinal's views likely were considered important. In any event, viewing the evidence in total, there is insufficient proof of racial bias to support a verdict in Plaintiff Coleman's favor.

McClore contends that SLS Bob Metzger, his direct supervisor at some unspecified time *before* 1995, "was much less cordial to the black employees than he was to the white employees." McClore Aff., ¶ 14. McClore provides no detail for his general observation and thus deprives it of probative value. In addition, at some unspecified time in the 1990s, McClore and another employee were teasing Metzger. In response, Metzger stated, "Well, at least I'm not black." *Id.* This exchange with Metzger is not probative of racial animus. The absence of specification of the time frame of Metzger's alleged hostile comment also deprives it of probative value, rendering it a mere stray remark.[47]

McClore testifies further that part of the reason he believed Metzger was "against" him is because "a couple of years ago, [Metzger] came to [McClore] and [they] spoke and [Metzger] gave [McClore] a semi-apology, in so many words, and stated that he [Metzger] would be proud to support [McClore] henceforth." Deposition of Carl McClore (Ex. C to McClore Motion) ("McClore Deposition"), at 200. McClore states that Metzger never mentioned or hinted that his prior opposition was race-based, and admits that the opposition might have been based purely on work performance. *Id.* at 200–01.

McClore states, without further elaboration, that Mark Stephens "started the wheels to get [him] demoted, and he never attempted any such thing with a white employee." McClore Aff., ¶ 15. It is unclear if Stephens was McClore's direct supervisor at this time. This incident, to which McClore specifies no date, appears to consist of Stephens asking another employee, Allen, if she thought McClore would be happier working in a different part of the plant when Stephens observed McClore having issues with a technician who reported to him. First Allen Aff., ¶ 12. This incident is ambiguous at best; it is mere speculation by Allen that Stephens's reason for suggesting a less desirable job was because McClore was Black. *Id.*

McClore contends that Ken Breedlove, his supervisor in the late 1980s, discriminated against him. McClore Dep., at 144. McClore states that Breedlove appeared to resent McClore's being able to solve a problem at the plant, and that Breedlove remarked "it wasn't as though [others who hadn't solved the problem were] stupid." McClore Aff., ¶ 18. McClore states, "I had no doubt but that he made that comment because I was black and had accomplished something that a white male had not been able to do." *Id.* Again, McClore's interpretation of this ambiguous incident is entirely speculative. The incident also is remote in time. McClore also recounts an occasion when Breedlove was unwilling to obtain equipment for McClore, *see* McClore Aff., ¶ 17, when he did so for his White subordinates. This incident apparently also occurred in the late 1980s. Accordingly, it is too remote in time to be probative. None of these incidents involving Breedlove constitute proof of racial bias, and all are, at best, vague or ambiguous actions that lack value to support McClore's claim of discrimination.

Finally, McClore contends that he and other minorities have been affected by a subtle racism:

> The way racism works in the ranking process is really a function of who is doing the ranking, and who their favor-

**47.** Incongruously, Coleman states that Metzger is the same SLS and "respected member of Exxon's management team" who tipped Coleman off in 1997 to the fact that his supervisors were "messing with him" during the rankings.

ite people happen to be.... [I]t is much easier for a white male to be comfortable with, and like and respect, another white male than it is for that same white male to like and respect someone who is different from himself: a female, or a black or Hispanic male. It is simply easy for SLSs to choose someone like themselves to stand up for—particularly if they are not challenged on what they are doing. With this type of socialization going on at BOP, the white male SLSs have more exposure to other white males in the ranking group—and thus will be more likely to either recommend or go along with a higher ranking for someone they know and like.

McClore Aff., ¶ 8. McClore's beliefs about White SLSs at BOP are stereotypical generalizations, based on speculation; they are not proof of racial animus against McClore, in specific rankings or salary decisions. *See Auguster,* 249 F.3d at 403.

The remarks, incidents and theories McClore offers[48] do not constitute probative evidence of racial animus by any SLS.

#### c. *Charlotte Allen*

 Allen lists a number of remarks she contends exhibit racial or gender bias. Allen's anecdotal evidence, while disturbing, is consistent in that all the incidents are extremely remote in time. Allen first states that in 1978, when she first began work at BOP, she told Bob Metzger that her goal was to become BOP's first female supervisor and he replied, "What makes you think you will ever be qualified to be a supervisor?" Sometime before 1983, Stephens criticized Allen for being too motherly. Allen Dep., at 27.

Sometime in the 1980s, an individual working at the plant, Randy Gillman,[49] told Allen that he wouldn't let his wife work, and that she was taking a job away from a man. Sometime in the 1980s, a BOP employee asked Allen who was taking care of her children. The above-cited remarks are too remote in time to constitute probative evidence of the claims at issue in this case. In addition, some of the comments were not made by SLSs. To constitute probative evidence of discrimination, remarks must be proximate in time to the adverse employment decision at issue and made by an individual with authority over the employment decision. *Brown,* 82 F.3d at 655–56; *Medina,* 238 F.3d at 683.

 Allen also recounts an incident, which apparently occurred some time in the 1980s, in which SLS Mark Stephens expressed concern about a Black technician being promoted to FLS because the last two technicians promoted were Black. First Allen Aff., ¶ 12. However, Allen states that Stephens admitted that the Black technician up for promotion was the most qualified candidate. *Id.* In addition, Allen indicates that although Stephens expressed concern that some White males in the department might be upset, the Black technician did get the job. *Id.* Accordingly, the remark is both too remote in time and too ambiguous to constitute evidence of racial bias.

 Allen testifies that, in 1990 or 1991, she reported to SLS Kevin Smith. Smith asked her to complete a project by a certain deadline, and when she told him it could not be done, he assigned a White male to follow her the next day. Second Allen Aff., ¶ 4. In addition to being remote

**48.** *See also infra* at 54 & n. 68, 58 n. 78 (concerning Joe Wolf's comments).

**49.** It is unclear what position Randy Gillman held, if any, at BOP. BOP personnel records

do not list him, indicating that either Plaintiffs have misidentified him or that he was never an Exxon employee. Second Morreale Aff., ¶ 9.

in time, there is nothing about the incident that creates an inference that Smith treated Allen differently because of her race or sex.

None of the above-mentioned incidents or comments constitutes probative evidence that raises a fact question as to whether any of the SLSs harbored racial (or gender) animus.[50]

### d. *Tony Williams*

■ Since 1995, Williams has been supervised by SLS Dave Veillon, 1995; Robert Hardesty, 1996; Mark Stephens, 1997–98; and Richard Ng, 1999. *See* Comparator's Supervisors; Deposition of Tony Williams (Ex. A to Williams Motion) ("T. Williams Deposition"), at 97; T. Williams Aff., ¶ 15. It is unclear who Williams's current supervisor is. *See* T. Williams Aff., ¶ 15. Williams's complaints are directed towards Mark Stephens, who was also his supervisor in years prior to the relevant time period for this case. First, Williams contends that before being promoted to FLS, he was required by Stephens to undergo a trial period as a "step-up" supervisor. T. Williams Aff., at ¶ 4. Williams successfully completed the trial period and was promoted to FLS. Williams contends that a White male, Rex Adams, in 1989 was promoted to FLS without having to undergo a trial period. *Id.* This incident is too remote in time to constitute probative evidence of race discrimination.

In addition, Williams admits that other technicians were required to be "step-up" supervisors before being promoted. T. Williams Dep., at 35–37.[51]

Second, in his affidavit, Williams contends that in 1994, Stephens "bullied" him into taking a short-term assignment in Montana although he did not pressure any White males to take the assignment. T. Williams Aff., ¶ 11. However, in his deposition, Williams acknowledges that while he did not want the Montana assignment, he does not construe the assignment to be racially motivated. T. Williams Dep., at 118–19.

■ Third, Williams states that in 1999 (after the period of Plaintiffs' claims), he volunteered to take an assignment in Singapore. He states that Stephens demanded that he groom a technician to take his place at BOP before going abroad. T. Williams Aff., ¶ 17. Another supervisor, Ken Breedlove, interceded and told Stephens not to attach any strings to Williams's accepting the assignment.[52] *Id.* Nothing about this incident indicates Stephens's request was motivated by a desire to punish or impose on Williams because of his race. Williams admits that he believes Stephens's behavior was racially motivated simply because Williams "[doesn't] see any other reason" for the conduct and because Williams felt that he was being "singled out." T. Williams Dep., at 52. Williams

**50.** In their Racial Comments Brief, Plaintiffs contend that in 1996 or 1997, John Mabry, Allen's SLS, told her that she was too emotional in dealing with her subordinates and that her tone sounded too motherly. However, the brief provides no citation in the record to this remark, nor did Allen mention this incident in her affidavits or deposition. This single recent comment, in any event, is ambiguous evidence of gender discrimination; Allen presents no evidence that her subordinates in fact had not made complaints about her management style.

**51.** It is not established that Stephens was the decision-maker responsible for the differential requirements.

**52.** Williams's contentions about Breedlove are inconsistent with McClore's. McClore refers to Ken Breedlove as the "worst encounter with a racist supervisor" he has had at BOP. McClore Aff., ¶ 17.

admits, however, that Stephens discouraged him from taking the Singapore assignment because Stephens didn't think it was a good assignment and Williams would lose pay, a characterization with which Williams agrees. T. Williams Dep., at 46, 48.

■■■ Finally, Williams states that in 1994, Stephens advised Dave Veillon, Williams's then-supervisor, to add negative comments to the PAC evaluation Veillon gave Williams. T. Williams Aff., ¶ 14. Not only did Veillon refuse, but there is nothing to substantiate Williams's claim that Stephens's action was racially motivated.

The incidents Williams describes are simply too ambiguous, vague and lacking in detail to constitute probative evidence of race discrimination. None of these incidents supports the claim that Williams's rankings were artificially depressed because of racial animus on the part of SLS Mark Stephens or others.

### e. *Gaines Owens*

■■■ Since the late 1980s, Owens has served as a training coordinator, administering safety and operations training at BOP. Unlike FLSs who work in the process or mechanical sections of BOP, Owens does not directly supervise any technicians. Owens contends that Charles Buckalew, his supervisor from 1992 to 1998, discriminated against him. Owens states that for a time he believed Buckalew was supportive of him: "Buckalew always presented himself to me as someone who was very supportive of my efforts to succeed in what I was doing and to advance my position at Exxon." Owens Aff., ¶ 3. Owens characterizes the evaluations Buckalew gave him between 1992 and 1998 as favorable, with very little criticism. *Id.*, ¶¶ 9–10. In addition, Buckalew also apparently confided to Owens that he believed Owens's ranking was lower than it should be because other White SLSs were afraid of Owens as a Black man. *Id.*, ¶ 3. However, Owens states that he no longer views Buckalew as a supporter:

> Later, I came to learn where I was in the rankings over the years, especially when compared to particular white FLSs of whom I had sufficient knowledge such that I could compare myself, I began to understand that Buckalew was no ally of mine whatsoever. He obviously did not, as other white supervisors do, go to bat for me in the ranking sessions. Despite all the compliments he lavished on me in our one-on-one discussions, he obviously kept all those to himself when he went into the ranking sessions. I find this particularly ironic now because he even told me at one point that it was unfortunate that other section supervisors did not understand what I was doing for them.

Owens Aff., ¶ 6. Owens's impressions of the ranking sessions are entirely speculative.[53] His belief that Buckalew was not a strong advocate is based purely on his own opinion of what his ranking should be. While Owens lists in some detail projects he has staffed and contributions he has made, *see* Owens Aff., ¶¶ 14–16, 18, 22–29, this qualitative description of his own performance is only part of the equation. The issue in the comparative ranking process used by Defendant is what SLSs thought of Owens's performance *relative* to that of other specific FLSs, particularly those in quintiles higher than his. Owens presents no evidence on these matters. Ultimately, what is probative for the analysis of Owens' ranking in any given year, as for any

---

**53.** Owens's explanation also indicates a lack of understanding of the process of collective input by various SLSs familiar with his performance.

FLS, is the opinions SLSs held of Owens's performance in a particular year after reasonable investigation and collaboration, how these opinions compared to the SLSs' views of others' performance against whom Owens was ranked in that same year, and whether those opinions were honestly held or were contaminated by racial bias. The only evidence in the record from an SLS familiar with Owens's performance is the testimony of Carmen Fahey, Owens's supervisor in 2000, which is after the relevant time period.[54] Fahey states,

> While the process of ranking is always going to be subject to some debate, given the detailed reports on the performance of other FLSs, my own experience, the articulated experience of other SLSs, customer input and related items, Mr. Owens' relative rank [of 13 for the 2000 rank list] was fair and reasonable. In fact, there was a general consensus among the many SLSs for whom he has performed services and myself on this issue.

Affidavit of Carmen Fahey (Ex. D to Owens Motion).[55] Thus, Owens has produced no evidence directly pertinent to his claim of racially biased rankings.

■ In support of his contention that Buckalew discriminated against him, Owens recounts that at some unspecified time in the 1980s, Buckalew told an offensive story about horse theft and used the word "nigger." Owens Aff., ¶ 4. This incident is far too removed in time to be relevant.

■ Owens also states that in 1997 or 1998, Buckalew was reluctant to let Owens attend a conference to present BOP's training system, and reluctant allow Owens to purchase needed equipment. Owens contends that Buckalew allowed a White subordinate, Phillip Lynch, to travel upon request and freely granted Lynch funding for new equipment. Owens notes that other supervisors tried to override Buckalew's decisions on his behalf. Owens Aff., ¶ 5. Owens complaints of inequitable allocation of training opportunities and/or equipment are incomplete. Owens held a somewhat unique job as a training coordinator, as opposed to a process or mechanical FLS. He provides no evidence about the circumstances and costs of the training and equipment he requested as compared to that requested by Lynch. There is no information about the position held by Lynch or the relevance of the training or equipment to Lynch's job functions. Accordingly, Owens's complaints provide, at most, a mere scintilla of evidence of disparate treatment based on his race.[56]

■ As other evidence of racial animus by other SLSs who were not Owens's direct supervisors, Owens states that in 1997, he had a conversation with SLS John Mabry. He and Mabry were discussing

---

54. As a training coordinator, Owens was also indirectly supervised by Human Resources Manager Gail Culberson, who was Owens's department manager. Second Culberson Aff., ¶ 40. Culberson states that based on her knowledge of Owens's performance and the discussions at the ranking session, she was generally comfortable with Owens' rank of 13 for the year 2000. However, Owens disputes that Culberson was actually in a position to substantively review his performance. Owens Aff., ¶¶ 17, 21.

55. Under Buckalew, Owens's ranking was 30 in 1996; 22 in 1997; and 14 in 1998. Under Steve Ames in 1999, his ranking was 12. Under Carmen Fahey in 2000, his ranking was 13. Although Owens disagrees with Ames's and Fahey's criticisms of his work, he does not contend that they discriminated against him. *See* Owens Aff., ¶¶ 15–16, 25.

56. Again, Plaintiffs' views of a particular SLS's racial biases are inconsistent. McClore testified that Buckalew strongly supported McClore's promotion from technician to FLS in 1983. McClore Dep., at 22.

the controversial book *The Bell Curve.* Owens perceived that Mabry speculated that since some people, like athletes, are born stronger than others, it might also be true that some people, or some races, might be born smarter than others. Owens Aff., ¶ 20. These comments are too ambiguous to constitute evidence of improper racial bias against Owens.

■ Finally, Owens contends that when Buckalew was preparing to retire, Owens expressed interest in being promoted to Buckalew's position. However, in the summer of 1998, he was told (he does not state by whom) that Exxon had already offered the job to someone. Eventually, the position was filled by Carmen Fahey (an African–American female). When Owens asked her when she had been offered the position, she told him she had not learned about the position until November of 1998. Owens states, "I can think of only two reasons why Exxon would lie to me about having someone else already lined up for that position: those in charge of the decision did not want me to have it, and they wanted to place someone in the position to mitigate any claims of discrimination." Owens Aff., ¶ 12. Owens's interpretation of the situation is obviously incomplete and speculative. The proof Plaintiffs present establishes neither that Owens was lied to, nor that he was denied a position for which he was objectively qualified.[57] Moreover, the fact that an African–American received the position deprives Owens of any claim of race discrimination relating to this promotion.

### f. *Reginald Carter*

■ Carter does not give any examples of remarks or incidents he considers racist, and he states that he has not been subjected to any racially derogatory remarks in the last five years.[58] Deposition of Reginald Carter (Ex. A to Carter Motion) ("Carter Deposition"), at 181–82. Carter states he does not believe that any of his direct supervisors have discriminated against him personally on a face-to-face basis. Carter Dep., at 197–98. He nevertheless does believe that his supervisors may have discriminated against him in the ranking process by not being strong advocates for him. Carter Dep., at 113–14. He admits that he has no facts to back up this belief; he merely points to the "end result" of a ranking lower than he believes he deserves. *Id.* The majority of Carter's affidavit discusses what he believes to be his contributions and accomplishments at BOP. Carter Aff., ¶¶ 7–14. Carter's disagreement with his ranking on substantive performance-based grounds, while sincere, does not amount to evidence of racial discrimination. Like Owens, *see supra* at 47, Carter presents no evidence of his performance *relative* to that of other FLSs ranked above him for any particular year.

### g. *Joseph Sloan*

■ Sloan was promoted to the position of FLS in 1996. In his deposition,

---

57. Owens does not dispute that Fahey possesses an engineering degree, which he does not; nor does he dispute that SLS positions are only rarely given to individuals without engineering degrees. For further discussion on this matter in connection with Owens's retaliation claim, *see infra* at 62 *et seq.*

58. Plaintiffs have also introduced the deposition testimony of Janice Cobble, a specialist at BOP. *See* Deposition of Janice Lynn Cobble (Ex. G to Coleman/McClore Response). Cobble mentions an incident in which a technician referred to Carter as a "nigger." *Id.* at 73–74. The incident occurred in the 1980s, and is therefore remote in time. In addition, because it was uttered by a technician, the remark is not evidence of racial animus on the part of any SLS.

Sloan recounts numerous incidents in which racially derogatory remarks or epithets were aimed at him.[59] *See* Deposition of Joseph Sloan (Ex. A to Sloan Motion) ("Sloan Deposition"), at 7–35. Although these remarks are unambiguously racist and worthy of condemnation, they all occurred in the 1970s and 1980s. Under the "stray remarks" doctrine, these comments are far too remote in time to be probative of racial animus during the relevant time frame and for the ranking decisions in issue.

As a FLS, Sloan has had three SLSs: John Mabry, Rob Peplinski, and Joe Wolf. Sloan contends that only John Mabry, his SLS for 1996 and 1997, discriminated against him. Sloan Dep., at 42.[60] Sloan contends that Mabry "went out of his way" not to support Sloan's decisions at the plant. Sloan Dep., at 35. However, Sloan admits he has insufficient knowledge of Mabry's interactions with other African–Americans to formulate an opinion as to whether this lack of support is personal or racial in nature.[61] Sloan Dep., at 35–36. Sloan also contends that Mabry treated him unfairly in a dispute with a technician, but does not claim Mabry acted with racial hostility against him. *Id.* at 38–42.[62] This evidence, therefore, does not raise any inference of discriminatory bias against Sloan because of his race.

■ As Defendant points out, Mabry was Sloan's supervisor when Sloan was promoted from technician to FLS. A technician or temporary FLS generally cannot achieve such a promotion without the support of his supervisor. Second Culberson Aff., ¶ 50. That Mabry supported Sloan's promotion triggers a presumption of non-discrimination. *See Faruki v. Parsons S.I.P., Inc.,* 123 F.3d 315, 320 n. 3 (5th Cir.1997); *Brown v. CSC Logic, Inc.,* 82 F.3d 651, 658 (5th Cir.1996) (under "same actor" doctrine, presumption of nondiscrimination attaches to supervisor who hires the plaintiff).

■ Sloan was not ranked in the FLS/Specialist rankings until 1998 (for his performance in 1997).[63] As a general practice, new FLSs are placed in the middle of the rank list. *See* Discussion Summary (Ex. 76 to Sloan Motion). Sloan was ranked at 40. A new White male FLS,

**59.** Sloan was called "nigger" and "boy." In addition, various comments of a derogatory and stereotypical nature were made, such as "you people are lucky to have jobs;" "if you weren't working, you'd be stealing hubcaps;" and "you people always find an excuse and blame others for your problems." *See* Racial Comments Brief, Attach. A.

**60.** In his affidavit and response, however, Sloan contends that Peplinski remained silent when Sloan's performance was discussed at the ranking session. Sloan Aff., ¶ 18 (stating that Joe Wolf told him Peplinski's silence had hurt his ranking). It is difficult to draw any racial implications from this silence, which in and of itself is ambiguous at best, in light Peplinski's vocal support of McClore during the same ranking session. *See* Wolf Aff., ¶ 8.

**61.** Sloan does not controvert other evidence of record regarding Emile Viola and Carl McClore, two other African–American FLSs working under Mabry at the same time as Sloan. Mabry ranked Emile Viola first among his direct reports, above Doug Olin, a White male. McClore does not contend that Mabry discriminated against him.

**62.** Sloan testifies that Mabry had expressed concern over the technician's performance and asked Sloan to supervise him closely. The technician complained to Mabry that Sloan had been harassing him. Without telling Sloan, Mabry "investigated" the matter. He later told Sloan he did not want the technician to file a harassment charge. *Id.* Again, Sloan admits that he does not know if Mabry behaved in the same fashion when White FLSs had disputes with technicians. *Id.* at 41–42.

**63.** Preparation of the 1997 rank list occurred before Sloan was promoted.

Tom Durousseau, was ranked above him at 55.[64] Although there is a 15 point disparity between these rankings, both are in the same quintile, the third (*i.e.*, the middle), quintile. While new FLSs are generally placed in the middle of the rank list, there is no requirement that they be clustered at exactly the same ranking or that their relative performance play no role in determining their rankings. In the absence of detailed evidence on their comparative performance,[65] Sloan has not created an inference that Durousseau's higher ranking was due to race.

■ Sloan states that Joe Wolf and Mike Williams told him that race plays a part in the rankings. Sloan Aff., ¶ 8.[66] Sloan testifies: "Wolf told me he believed Carl McClore and I should have been ranked higher than certain white males on the rank list, but were not because of our race." *Id.* While Wolf's remark might be sufficient to produce a fact question as to pretext or discrimination for a ranking session in which he was involved,[67] Wolf participated only in the ranking process for the 2000 rank list. *See* Wolf Aff., ¶ 15. Plaintiffs do not claim discrimination for

events beyond 1998. *See supra* at 6–7 n. 9. Wolf's remark therefore has no probative value for Sloan's claims.[68] Even if Plaintiffs *did* claim discrimination for years after 1998, Wolf's remark pertains only to the one ranking session he attended. As to Mike Williams's belief regarding the role of race during the ranking sessions, his comments reflect only a theoretical view, and have not been tied to any particular FLS's ranking in any particular year. *See supra* at 38–39.

■ Finally, Sloan describes a disturbing incident that occurred in 1999. The word "nigger" was written on Sloan's nameplate outside his office. Exxon addressed the matter promptly and performed a thorough investigation. *See* Memo to all BOP Employees, September 10, 1999 (Ex. C to Sloan Motion) (mentioning that a racial slur was found, stating that such conduct would not be tolerated, and attaching the company's EEO policy); Letter from J.P. Noel, Exxon Chemical Corp., to Michael Morton, American Protective Services, Inc., Oct. 8, 1999 (Ex. D to Sloan Motion) (requesting that custodial company immediately report and remove

64. Another new White male FLS, Doug Hamilton, was ranked at 80. Hamilton's ranking was a significant departure from the established practice of placing new FLSs in the middle of the rank list. The move caused consternation among White and Black FLSs alike, as well as among some of the SLSs. *See* 1998 Draft Rank List (Ex. 8 to Sloan Motion); Culberson Aff., ¶ 26. Plaintiffs have produced no evidence to establish that Hamilton's ranking was not based on the sincere views of SLSs that his performance for that year was extraordinary.

65. Sloan states that he was surprised to see Durousseau ranked higher because he had worked on more special projects than Durousseau. Sloan Aff., ¶ 5. Again, there is no basis to infer from this fact that the ranking was based on race, as opposed to other factors. As discussed above, Plaintiffs' attempts to show disparate treatment by comparing

themselves to White FLSs on the basis of one specific characteristic is ineffective.

66. In his deposition, Sloan states that although Wolf did not explicitly state that he believed race played a part in Sloan's ranking, Sloan inferred Wolf's meaning from the context of their conversation. Sloan Dep., at 201–203.

67. Although Wolf apparently told Sloan that Sloan should have been ranked higher, *see* Sloan Aff., ¶ 8, Wolf states that he believes Sloan's "approximate position" on the 2000 rank list was reasonable. Wolf Aff., ¶ 13. Wolf also states that he confidently ranked Sloan the lowest of the four FLSs who report directly to him. *Id.*

68. Nor would Wolf's remark serve as probative evidence for McClore's claims.

any graffiti on BOP premises). The culprit was never found. In any event, Sloan does not contend the slur was written by any of the SLSs. *See* Sloan Dep., at 69; Notes of Meeting with Joe Sloan, September 8, 1999 (Ex. 73 to Sloan Motion).[69] Accordingly, this incident bears little, if any, relevance to the disparate treatment claims relating to the salary of Plaintiffs as a result of Defendant's ranking system, the only claims at issue in this case.[70]

Although Sloan has produced persuasive indications of some racism *in general* at BOP in the distant past—the derogatory comments from the 1970s and 1980s—and the recent graffiti incident by an unknown person, the evidence simply is not probative of his or other Plaintiffs' claims in this case of racial bias in salaries. Sloan has failed to produce evidence sufficient to create a fact question as to whether he suffered intentional discrimination at the hands of any of the SLSs who participated in the ranking sessions that affected his salary.

### h. *Summary of Anecdotal Evidence*

Many of the incidents described above did not involve SLSs and are thus irrelevant, given Plaintiffs' theory of discrimination (*i.e.*, disparate treatment of FLSs by SLSs in ranking and thus salaries, not hostile environment).[71] In addition, many of the incidents are remote in time[72] or vague and ambiguous.[73] Many others constitute Plaintiffs' personal disagreement with management decisions, as to which any racial connotations stem from Plaintiffs' speculation. The isolated incidents that occurred during the mid- or late–1990s are matters on which reasonable managers could differ, and do not supply probative evidence of racial bias, let alone bias by SLSs that was manifested during ranking sessions to affect one or more Plaintiffs' salary.

When viewed *in toto*, many of Plaintiffs' allegations of racial animus on the part of various SLSs are contradicted and belied

---

**69.** When Sloan discussed the incident with Culberson, he believed that she was insinuating that he wrote the slur himself. Sloan Aff., ¶ 11. Sloan states that Joe Wolf, who also attended the meeting, had the same impression. *Id.* The incident occurred while Sloan was away from the plant and the writing was wiped off his nameplate before he could see it. Culberson asserts she mentioned the writing on the nameplate was similar to Sloan's own handwriting merely to describe the writing to Sloan. *See* Notes of Meeting with Joe Sloan, September 8, 1999. There is no evidence from Wolf on this matter. Even if these events constitute a fact dispute as to Culberson's reaction to Sloan's complaint, it is not material since there is no evidence that Culberson ranked Sloan or influenced his ranking in any way.

**70.** The hostile environment claims initially raised by Sloan and other Plaintiffs have been abandoned. *See* Supplemental Response, at 2 n. 1.

**71.** Accordingly, Janice Cobble's testimony that she saw graffiti on plant equipment of a

sexually explicit or racially derogatory nature at various times in the 1980s and unspecified times in the 1990s is not probative evidence of racial animus on the part of any SLS. Cobble Dep., at 64–66. Cobble states that she does not know who drew the graffiti. *Id.* at 65.

**72.** For instance, all of Allen's incidents that are proven in the summary judgment record are far too remote in time to be probative.

**73.** To the extent certain limited evidence from Plaintiffs Coleman, Owens or Sloan could be construed, when taken in the light most favorable to Plaintiffs and ignoring their speculation and lack of detail, as sufficient to raise a fact question as to them, respectively, *see supra* at 37–38 & n. 46 (Coleman), 48–49 (Owens), 54 (Sloan and McClore), and 54–55 n. 69 (Sloan), the evidence is nevertheless insufficient to satisfy each Plaintiff's summary judgment burden to adduce proof to support a verdict in his favor.

by the testimony of other Plaintiffs. For instance, Bob Metzger was considered a racist by McClore. But Coleman viewed Metzger as an honorable SLS who attempted to warn him about the alleged "shenanigans" of other SLSs during the ranking sessions. Similarly, McClore and Sloan describe Ken Breedlove as a racist, although Williams saw Breedlove as someone who interceded on his behalf with another allegedly racist SLS. Owens and Sloan contend that John Mabry was a racist, but McClore, who was Mabry's direct report at the same time as Sloan, voices no complaints about Mabry and characterizes their working relationship as good and amicable. Sloan contends that Rob Peplinski was motivated by racial animus when Peplinski allegedly failed to speak up on Sloan's behalf at a ranking session, but Peplinski was apparently a very vocal advocate for McClore at the same session.

Plaintiffs' cumulative evidence does reveal that five of the seven plaintiffs (Coleman, McClore, Allen, Williams and Owens [74]) perceive that in some fashion SLS Mark Stephens discriminated against African–Americans.[75] None of the superficial allegations regarding Stephens, standing alone, has been shown with sufficient detail, has a premise other than speculation, or been shown to have material probative value. Thus, these accusations collectively do not suffice to raise a fact question as to racial animus on Stephens's part.

In addition, the SLSs who testified on the record in this case each stated their opinion that race did not play any significant role in the rankings. *See* Culberson Aff., ¶ 24 (stating that sex also was not a factor in the rankings); Lattimer Aff., ¶ 17; Fahey Aff., ¶ 11.[76] According to *Plaintiffs'* testimony, Mike Williams, Melvin Parker, Charles Buckalew, and Joe Wolf [77] all believe generally that race plays a part in the rankings. As noted above, however, Williams gives only philosophical opinions about racial biases in general, and Plaintiffs' testimony as to Parker's and Buckalew's opinions is sketchy at best. SLS Joe Wolf's opinions, even if probative as to Sloan or McClore for the year he participated in the ranking sessions, 2000, do not assist Plaintiffs in this case since his observations are about events which occurred outside of the time period relevant to this case.[78] None of the Plaintiffs nor

---

**74.** Owens states that he refused to work for Mark Stephens because of Stephens's discriminatory tendencies. Owens Aff., ¶ 19.

**75.** In addition, several Plaintiffs mention an episode of unspecified date in which Stephens apparently attempted to block the rehire of a Black employee named Richard Pennie. Plaintiffs contend that it was very unusual for a former employee not to be rehired. *See* Allen Aff., ¶ 12; Coleman Aff., ¶ 15; McClore Aff., ¶ 15.

**76.** *See also* M. Williams Dep., at 132. Williams also testified that ranking session discussions are limited to work and performance issues. In reply to Plaintiffs' counsel's inquiry of whether a SLS's personal friendship with a FLS might influence rankings, Williams stated, "We don't talk about hunt-

ing, fishing, what you do down at Joe's Crab Shack or whatever. That's not part of the process."

**77.** *See supra* at 38–39 (Williams); 38 (Parker); 46 (Buckalew); 54 (Wolf).

**78.** As noted earlier, Plaintiff Sloan testifies that Wolf told him that his rank, and McClore's had been hurt by racial bias. Sloan Aff., ¶ 8. However, Wolf's opinions appear to be somewhat conflicting. Wolf himself testified that, although he would be more comfortable if McClore were ranked one quintile higher, nothing in the 2000 ranking session led him to believe that race was a negative factor in McClore's ranking. Wolf Aff., ¶¶ 9, 14. Wolf also stated that he was comfortable with Sloan's approximate placement on the rank list. *Id.* at 13.

SLS Williams has provided any testimony regarding specific examples of SLS racial bias materially influencing a FLS's ranking in a particular year before (and including) 1998. Thus, SLS Williams's testimony and the other SLSs' reported general speculation concerning racial bias do not constitute probative admissible evidence of racial bias that supports Plaintiffs' claims that race played a role in the ranking sessions to affect any Plaintiff's rank or, more importantly, any Plaintiff's quintile, and thus salary, in any specific year.

### 4. Plaintiffs' Other Contentions

█ In addition to the evidence discussed above, Plaintiffs vehemently criticize the secrecy of the ranking process prior to 1998, as if this were *prima facie* evidence of its insidious nature; the failure to train SLSs or constrain their subjectivity with objective performance criteria; the grouping of different jobs into a single FLS/Specialist category; and the disparity between performance evaluations at the individual (PAC) level versus comparative group rankings. These criticisms, while disquieting, ultimately are unavailing. The employment discrimination laws are not a "vehicle for judicial second-guessing of business decisions." *Guthrie v. Tifco Indus.*, 941 F.2d 374, 378 (5th Cir.1991) (citation omitted); *accord Walton*, 119 F.3d at 372. The relevant inquiry is not whether Exxon's ranking system could be improved, whether the ranking process could be more open to later scrutiny and well-documented for posterity, or whether the ranking process and related business decisions are wise business practices; this Court's role is to assess whether Plaintiffs have shown the system, as it impacted them, included discriminatory bias. *See Grimes v. Texas Dept. of Mental Health*, 102 F.3d 137, 142 (5th Cir.1996); *Risher v. Aldridge*, 889 F.2d 592, 598 (5th Cir.1989).

The criticisms lodged by Plaintiffs fail to meet this goal.

### 5. Summary and Cumulative Value of Plaintiff's Evidence of Discrimination

█ In the final analysis, Plaintiffs' theory of this case is that there is collective or "subtle" racism that results in discrimination against minorities in salary determinations. However, "[e]mployment discrimination statutes do not prohibit discrimination in a vacuum, but only in the concrete context of a specific job or job category." *Holtzclaw v. DSC Communications Corp.*, 255 F.3d 254 (5th Cir.2001). Defendant operates a facially nondiscriminatory ranking system to set annual salaries. This ranking system, while far from ideal in this Court's view, contains various efforts designed to safeguard against discrimination, most importantly, the use of multiple rankers, multiple sources of information for the rankers to access, open discussion of the comparative performance of the FLSs, and repeated warnings by management that discrimination is prohibited.

On summary judgment, since the Court has assumed Plaintiffs met their *prima facie* burden, each Plaintiff fundamentally must show that he or she has evidence to raise a genuine question of fact that Defendant's ranking system is pretext for discrimination against him or her in one or more years, or that Defendant through SLSs' conduct in the ranking sessions, more likely than not, intentionally lowered a Plaintiff's quintile ranking for one or more years from 1995 to 1998, because of his or her race. Evidence that a Plaintiff did a "good" job, or that he did a "better" job than his ranking might indicate in some abstract sense, does not satisfy this burden. In the challenge to Defendant's comparative ranking system, a Plaintiff

must show that his performance in a particular year, as measured by the collective body of SLSs, was the same as or better than the performance of other FLSs ranked in higher quintiles. No Plaintiff has submitted evidence sufficiently detailed so as to be probative of these matters. Plaintiffs' claims essentially rest on the assertions (or Plaintiffs' report of assertions) by one or more SLSs that "race played a role in the rankings." *See supra* at 58. These conclusory comments are clearly insufficient to sustain a jury verdict, even when considered in the context of each Plaintiff's anecdotal evidence. Plaintiffs have thus failed to adduce probative evidence sufficient to raise a genuine material fact question that they have suffered discrimination in the administration of the ranking process.

Plaintiffs also have not raised a genuine fact question that the ranking process *per se* is merely a pretext for intentional discrimination by Defendant. Defendant's ranking system is a longstanding practice that Defendant has repeatedly refined. M. Williams Dep., at 34. In addition, the record shows that Defendant has taken swift measures to address individual instances of discrimination, *see supra* at 54, and issues raised by minorities, *see supra* at 5 & n. 8. Nor is this a case in which Plaintiffs can rely on a strong *prima facie* showing to mitigate weak evidence of pretext and/or discrimination, because it is entirely unclear that Plaintiffs can make their *prima facie* case. *See Crawford,* 234 at 902 (citing *Reeves,* 530 U.S. at 148–49, 120 S.Ct. 2097).

 Plaintiffs have introduced several different types of evidence in an attempt to show pretext and/or discrimination by SLSs. However, none of this evidence, viewed separately or collectively, is sufficiently probative to support a judgment in any Plaintiff's favor. Plaintiffs' argument

that "the whole is greater than the sum of its parts," and thus that their cumulated evidence is sufficient to support a jury verdict, is unavailing. Evidence that does not imply pretext taken alone does not do so when aggregated with other insignificant evidence or inadmissible proffers. *EEOC v. Texas Instruments, Inc.,* 100 F.3d at 1186–87; *accord Scott,* 148 F.3d at 512. In *Texas Instruments,* the Fifth Circuit noted:

> EEOC strenuously criticizes the district court for having discounted each of its types of evidence [alleged 'ageist' comments; the employer's departure from prior procedures and standards; and statistical data] separately and [ignoring] that, taken together, all of the agency's evidence bespoke pretext sufficiently to warrant a jury trial. The district court was obliged, however, to consider the admissibility of evidence offered to support the parties' summary judgment positions pursuant to Fed. Rule Civ. P. 56(e).

*Id.* at 1186–87. In the case at bar, the Court has analyzed Plaintiffs' comparator, statistical and anecdotal evidence separately. Plaintiffs' evidence, while superficially voluminous, on close inspection, lacks substance. Pieces of evidence that lack probative value alone afford no greater support for Plaintiffs' claims collectively.

**E. *Retaliation Claim for Gaines Owens***

Plaintiff Owens contends he suffered retaliation after complaining to BOP management in June 1998 about the ranking system's impact on minorities. Owens contends that he was denied a promotion to SLS in 1999, and that after his complaints, he received lower ratings on his PAC evaluations and lower rankings on the rank list.

■ In order to establish a *prima facie* case of retaliation, a plaintiff must establish that (1) he engaged in an activity protected by Title VII; (2) an adverse employment action occurred; and (3) there was a causal connection between participation in the protected activity and the adverse employment action. *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 427 (5th Cir.2000); *Burger v. Central Apartment Management, Inc.*, 168 F.3d 875, 878 (5th Cir.1999). If the plaintiff successfully establishes a *prima facie* case, the burden then shifts to Defendants to articulate a legitimate, nondiscriminatory reason for the allegedly retaliatory conduct, and then back to Plaintiff to prove that the proffered reasons are pretextual. *Ray v. Tandem Computers*, 63 F.3d 429, 435 (5th Cir.1995).

Defendant does not dispute that Owens engaged in protected activity by complaining about the ranking system to BOP management in June 1998. Owens's three alleged adverse employment actions are addressed separately below.

### 1. SLS Promotion

■ When Owens's SLS Charles Buckalew retired in 1998, Owens expressed interest in the position. While Plaintiff contends in his briefing that the position was awarded to a White male, Owens' affidavit states the position was filled by Carmen Fahey, an African–American female, in approximately November 1998. *See* Supplemental Response, at 4; Owens Aff., ¶ 12. A plaintiff may show a "causal connection" between his protected activity and the adverse employment action through temporal proximity. *Evans v. City of Houston*, 246 F.3d 344, 354 (5th Cir.2001) (noting leniency of *prima facie* "causal link" test and

that a "time lapse of up to four months has been found sufficient to satisfy the causal connection for summary judgment purposes."). Owens is deemed to have met his *prima facie* burden on this theory.

■ However, a review of all surrounding circumstances as evidenced by the summary judgment record leads to the conclusion that Owens has failed to raise a genuine fact question that Defendant's explanation for its promotion choice is pretext. As a legitimate non-discriminatory reason for Owens's failure to receive the promotion, Defendant contends that Owens was not qualified to receive the promotion. At BOP, virtually all of the SLSs are degreed engineers. *See* Culberson Aff., ¶ 37; McClore Dep., at 72; Williams Dep., at 13. Owens did not possess an engineering degree, although Fahey did. While it is true, as Owens points out, that several individuals without engineering degrees have been promoted to SLS, he has produced no evidence to show that he merited this exception. Owens has produced no evidence that Defendant's explanation for Fahey's appointment over him was false, or that the decision was based in any way on Owens's having complained about the ranking system. Accordingly, Owens has failed to raise a genuine fact question as to Defendant's decision to not to promote him.[79]

### 2. PAC Evaluations

■ Plaintiff complains that his "PAC was intentionally altered by his second-line supervisor to include many low ratings that did not previously exist." Allen, *et al.*, Sur–Reply, at 9. In his Affidavit, Owens states: "Until very recently (after the disclosure and the complaint),˙ I never re-

---

**79.** The Court notes that no other Plaintiff in this case claims retaliation for complaining about the ranking system. Indeed, Coleman received a˙ promotion in 1999, after the filing of the EEOC complaint which preceded this litigation.

member any categories that were checked 'below' most on my PACs or discussed with me as being such." Owens Aff., ¶ 8. During a discussion of his performance with his supervisors in March 1999, Owens notes, "I had a concern since [SLS] Steven [Ames] had stated earlier that everything was out of his hands and that Gail [Culberson] was handling the final outcome of my performance appraisal." *See* G. Owens' Rebuttal to 1998 Performance Appraisal (Ex. F to Allen, *et al.*, Response).

■ Plaintiff does not establish a *prima facie* case on this theory because receiving a "false" PAC evaluation is not an adverse employment action. Only "ultimate employment decisions" can trigger violations of the anti-retaliation provision of Title VII. *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 705 (5th Cir.1997). Title VII was designed to address "ultimate employment decisions" such as hiring, discharging, promoting, and compensating, but is not designed to "address every decision made by employers that arguably might have some tangential effect upon those ultimate decisions." *Dollis v. Rubin*, 77 F.3d 777, 781–82 (5th Cir.1995); *accord Evans*, 246 F.3d at 353. The PAC, a counseling tool, did not determine Owens's salary decisions, and thus was not an ultimate employment decision under Fifth Circuit authority.

The testimony of Plaintiffs' own expert Mary Konovsky defeats Owens's contentions. Konovsky focuses on the "independence of the ranking process and the PAC process" and then notes that information on individual evaluation forms was "changed by HR personnel at Exxon" so that evaluations would be "consistent with the results of the ranking process." Konovsky Report, at 2. Konovsky concluded

that "the information provided [on individual evaluations] did not significantly influence the ranking process.... If there was any influence, the ranking process and outcome influenced the nature of the information on the [individual evaluation] forms." *Id.*[80]

Indeed, Owens was specifically informed that Human Resources Manager Gail Culberson reviewed and edited PAC forms. In a letter dated April 30, 1999, Culberson wrote to Owens to respond to some concerns he had raised regarding his 1998 performance review. *See* Letter from Gail Culberson to Gaines Owens, April 30, 1999 (Ex. 69 to Allen, *et al.*, Reply). Culberson writes: "I had advised Carmen [Fahey, then Owens's SLS] to mark both boxes as 'below most' to provide you with a reflection of how your overall performance fared relative to others (*i.e.*, in the bottom third). My intent in doing this was to ensure you received a very clear message that relative to your peers, your performance was below the majority of them." *Id.* at unnumbered second page. Plaintiff has produced no evidence that the changes in his post-complaint PAC evaluations were the result of anything other than these human resources practices, or that he was singled out for special treatment different from his peers with respect to the handling of PACs.

### 3. Lower Rankings

■ Owens complains that his ranking dropped eight points between 1997 and 1998. Allen, *et al.*, Sur–Reply, at 9. On the 1997 rank list, Owens' ranking was 22; on the 1998 rank list, his ranking was 14. However, there can be no causal connection between this drop in ranking and Ow-

---

80. Konovsky's findings are consistent with the deposition testimony of Gail Culberson. *See* Culberson Dep., at 57–58, 184–185.

ens's complaints to management. The 1998 rank list was prepared before Owens complained about the ranking system-indeed, it was discovery of the 1998 rank list that sparked Plaintiffs' complaints.

■ Owens also complains about being ranked at 12 and 13, respectively, on the 1999 and 2000 rank lists. These ranks, however, are nearly identical to the ranking he received in 1998. In addition, per the parties' stipulation at oral argument, salary is impacted only when a FLS changes *quintiles* on the rank list. A drop in rank from 14 to 12 or 13 presents no quintile change, and therefore does not constitute an adverse employment action. Owens thus has failed to state a *prima facie* case of retaliation for any drop in his rank group percentile.

Owens has failed to raise a genuine question of fact on any theory of his retaliation claims, and the claim must be dismissed.

## IV. *CONCLUSION*

The Court has assumed, without deciding, that Plaintiffs have met their *prima facie* burden in a disparate treatment case based on race (and, in Charlotte Allen's case, sex).

As its legitimate, nondiscriminatory rationale for Plaintiff's rankings and salary, Defendant asserts that Plaintiffs merely had been subjected to the facially neutral ranking system used to rank all FLSs and specialists at BOP.

To show pretext and/or unlawful intent in the third step of the *McDonnell Douglas* test, Plaintiffs have attempted to show Defendant's explanations are false or that Plaintiffs have in fact suffered discrimination at the hands of individual SLSs in the ranking sessions or elsewhere. Plaintiffs' purported "comparator" evidence fails to raise a genuine fact question that any

Plaintiff has suffered disparate treatment. Plaintiffs' grounds for claiming nearly identical circumstances with various White male FLSs, comments and ratings contained in individual PAC evaluations, are insufficient, given the nature of the ranking system, in which each FLS's performance is ranked by multiple SLSs in comparison with the performance of every other FLS, and given the somewhat different purposes of the PACs. As in any evaluation system based on *relative* ranking of employees, skilled FLSs may fare relatively poorly when compared to the other skilled FLSs. Plaintiffs' statistical evidence also fails to satisfy their summary judgment burden to raise a genuine question of fact on their disparate treatment claims. Plaintiffs' statistics are fundamentally methodologically flawed and therefore are too unreliable to be received in evidence. In any event, the data do not show gross statistical disparities between salaries of FLSs in the pertinent racial groups, African–American or female FLSs and non-Hispanic White male FLSs. Plaintiffs' anecdotal evidence that they proffer to show racial animus on the part of several individual SLSs also fails to raise a genuine fact question as to pretext or race (or sex) discrimination. The various racially charged comments and incidents described by Plaintiffs are either too remote in time, too ambiguous in nature, or too vaguely described to constitute probative evidence. Accordingly, Plaintiffs have not produced evidence sufficient to support a jury verdict in their favor.

Plaintiff Owens's retaliation claim also fails. Two of the alleged retaliatory actions about which Owens complains, lower ratings on PAC evaluations and a point or two drop on the rank list, do not constitute adverse employment actions. As to Owens's claim that he was denied a promotion to SLS in retaliation for complaining about

the rank system, Owens has produced no evidence to rebut Defendant's contention that he was not qualified for the SLS position.

It is therefore

**ORDERED** that Defendant's Motion for Summary Judgment on the Claims of Ed Coleman [Doc. # 34] is **GRANTED**. It is further

**ORDERED** that Defendant's Motion for Summary Judgment on the Claims of Carl McClore [Doc. # 35] is **GRANTED**. It is further

**ORDERED** that Defendant's Motion for Summary Judgment on the Claims of Charlotte Allen [Doc. # 41] is **GRANTED**. It is further

**ORDERED** that Defendant's Motion for Summary Judgment on the Claims of Reginald Carter [Doc. # 42] is **GRANTED**. It is further

**ORDERED** that Defendant's Motion for Summary Judgment on the Claims of Tony Williams [Doc. # 43] is **GRANTED**. It is further

**ORDERED** that Defendant's Motion for Summary Judgment on the Claims of Gaines Owens [Doc. # 44] is **GRANTED**. It is further

**ORDERED** that Defendant's Motion for Summary Judgment on the Claims of Joseph Sloan [Doc. # 45] is **GRANTED**. It is finally

**ORDERED** that Defendant's Conditional Motion for Separate Trials [Doc. # 64] is **DENIED AS MOOT**.